2011 Ark. 515

**Erickson DIMAS–MARTINEZ,**
**Appellant**

v.

**STATE of Arkansas, Appellee.**

**No. CR 11–5.**

Supreme Court of Arkansas.

Dec. 8, 2011.

Janice Wegener Vaughn, Ark. Pub. Defender Comm'n, Little Rock, AR, for appellant.

Dustin McDaniel, Atty. Gen., Eileen W. Harrison and Valerie Glover Fortner, Asst. Attys. Gen., Little Rock, for appellee.

DONALD L. CORBIN, Justice.

|₁Appellant Erickson Dimas–Martinez appeals an order of the Benton County Circuit Court convicting him of capital murder and aggravated robbery and sentencing him to death and life imprisonment, respectively.[1] On appeal, he alleges that the circuit court erred in (1) denying his motion for a mistrial after informing the jury that this court would automatically review Appellant's case; (2) refusing to dismiss jurors who disregarded the circuit court's instructions or to subsequently declare a mistrial; (3) allowing the State to introduce evidence during sentencing of a prior incident for which Appellant had not been charged or convicted; (4) allowing evidence of unrelated bad acts, weapons, and ammunition; and (5) ordering a new mental evaluation at the request of the State. Because Appellant was sentenced to death, we have jurisdiction pursuant to Arkansas Supreme Court Rule 1–2(a)(2)

---

1. Although the State asserts that Appellant is only challenging his conviction for capital murder, the notices of appeal reflect that Appellant is appealing his convictions for both capital murder and aggravated robbery.

(2011). We reverse Appellant's conviction and sentence and remand this matter for a new trial.

Because Dimas–Martinez does not challenge the sufficiency of the evidence supporting his convictions, only a brief recitation of the facts is necessary. *See, e.g., Vance v. State,* 2011 Ark. 243, 383 S.W.3d 325. The record reflects that authorities were notified of a possible homicide just inside the Springdale city limits on December 30, 2006. Authorities found the partially clothed body of a young black male lying on his back with a single gunshot wound to the center of his forehead. The victim was later identified as seventeen-year-old Derrick Jefferson.

In the course of investigating the homicide, authorities interviewed several people who saw Jefferson just before his murder. Wilfredo Cortez told authorities that he met Jefferson, through his sister Melissa Cortez, on December 30, 2006. Cortez, Melissa, Jefferson, and Jefferson's friend, Freddie Ochoa, went to the Bottoms Up nightclub in Fayetteville, but left after a short time. After leaving the club in Fayetteville, the foursome split up, with Jefferson going with Cortez to the Rio Bravo club in Springdale. When the pair arrived at Rio Bravo, they discovered it was closed. While in the parking lot, another car pulled up. Inside the second car were two Hispanic males and two white females. Authorities later discovered that the two men were Appellant and Uris Magana–Galdamez, also known as Jason. The females were sisters, Keri McConnell and Candie Drain.

McConnell and Drain invited Jefferson and Cortez to a party at a duplex in Springdale, and they agreed to go. Sometime shortly after arriving at the party, Jefferson left with Drain to go to a store to buy cigarettes but came back a few minutes later. Cortez told authorities that he grew nervous, and when Jefferson returned Cortez demanded that they leave. Jefferson did not want to leave the party and went inside the house to see if he could find a ride home, and Cortez then left.

According to Ladislao Magana–Palma, who was renting the duplex where the party was and who is also Magana–Galdamez's uncle, Appellant told Jefferson he would give him a ride home. Magana–Palma stated that shortly thereafter, Appellant told Jefferson it was time to go, and Appellant, Jefferson, Magana–Galdamez, and the girls, McConnell and Drain, left in Appellant's car. Drain stated that Appellant gave Jefferson the car keys and asked Jefferson to drive because Jefferson had not been drinking. Appellant told the group he wanted to stop by a friend's house. Appellant went in alone and returned to the car about fifteen minutes later. He instructed Jefferson to stop at a second house, stating he had to get something. Appellant and Magana–Galdamez got out of the car to talk. Appellant then walked back to the car and asked if anyone had a cell phone. When they each denied having a cell phone, Appellant stuck a gun in the window, pointed it at Jefferson, and told him to get out of the car. Appellant continued to point the gun at Jefferson, while Magana–Galdamez held a knife on him, and demanded that Jefferson give him all his money. Appellant then ordered Jefferson to give him his shirt and jacket and snatched a hat off of Jefferson's head. Magana–Galdamez got into the driver's seat and started the car. As Appellant started to return to the car, Jefferson followed and Appellant turned and shot him. When Appellant got back into the car, he told Drain and McConnell not to say anything and threw a ten dollar bill into the backseat where they were sitting. He again threatened the girls, telling them

he would harm their family if they said anything about the murder.

Appellant was arrested and charged with one count each of capital murder and aggravated robbery.[2] He was tried before a jury and convicted and sentenced as set forth above. Thereafter, Appellant filed a motion for new trial, arguing that there was juror misconduct, which warranted a new trial. Specifically, Appellant asserted that a juror was tweeting during the trial, despite specific instructions from the judge to not do so and, thus, where it was apparent that the juror could not follow the judge's instruction in that regard, it could not be assumed that he followed the instructions with regard to the law. The circuit court denied the motion for new trial. This appeal followed.

## I. *Violation of* Caldwell v. Mississippi

As his first point on appeal, Appellant argues that the circuit court erred in refusing to grant a mistrial after informing the jury that this court would automatically review Appellant's case. According to Appellant, the circuit court made repeated references to this court's appellate review, thereby violating the Supreme Court's decision in *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which prohibits the prosecutor in a case from informing a jury that an appeal will be had. The State argues that part of Appellant's argument is not preserved for review, as Appellant failed to make a proper objection. Moreover, the State asserts that there is no *Caldwell* violation where the circuit court never specifically addressed the jury's role in sentencing and did not affirmatively misstate the law or mislead the jury in any way.

Because we are reversing Appellant's convictions and sentences based on the issue of juror misconduct and remanding for a new trial, it is not necessary to address the merits of this argument. *Bradford v. State*, 325 Ark. 278, 927 S.W.2d 329 (1996). As the challenged statements were made by the circuit judge, who has since retired from the bench, it is unlikely that this issue will arise again during a new trial and, thus, we need not address it.

## II. *Juror Misconduct*

Next, Appellant argues that the circuit court erred in failing to dismiss jurors who disregarded the circuit court's instructions and, thereafter, in failing to grant his motion for a mistrial based on allegations of juror misconduct. Specifically, Appellant points to the facts that one juror fell asleep during the guilt phase of the trial, a fact that was brought to the circuit court's attention, and a second juror was posting on his Twitter[3] account during the case, and continued to do so even after being questioned by the circuit court, as evidence of juror misconduct that calls into question the fairness of his trial. The allegation of juror misconduct related to the juror tweeting during the trial was also raised in a motion for new trial but denied by the circuit court. The State counters that Appellant did not preserve an objection to the sleeping juror and cannot demonstrate prejudice with regard to the twittering

**2.** Magana–Galdamez was also arrested and charged as an accomplice, but the two cases were ultimately severed.

**3.** Twitter is a real-time information network that lets people share and discuss what is happening at a particular moment in time through the use of "tweets," updates composed of 140 characters or less. *See* Twitter, available at *http://twitter.com/about*. The service allows users either to Direct Message (DM) specific individuals or to use "twitter posts" accessible to the public. The process of posting messages on Twitter is commonly referred to as "tweeting."

juror as the juror never tweeted specifics about the case. Because we conclude that the one juror sleeping and a second juror tweeting constituted juror misconduct, we reverse and remand for a new trial.

Before turning to the merits of the juror-misconduct issue, we must review the State's allegation that Appellant failed to preserve the issue of juror misconduct with regard to the sleeping juror. The record reflects that counsel for Appellant requested a bench conference, wherein she stated that

> I would like you to take note that the juror who's seated in juror's seat number ten is sleeping quite a bit and I would like the Court to kind of keep an eye so we could ask to have him removed if it continued.

The circuit court replied that he had been watching the juror (hereinafter referred to as "Juror 1") and that "[h]e comes and goes. I've sent him a cup of water." Thereafter, the court recessed proceedings and sent the jurors on a break. Counsel for Appellant reiterated her concern about Juror 1:

> Mr. Saxton was actually making note of the time that he nodded off. There were five minutes at times when he was sleeping and then he was in and out, and his co-juror seated to his right was nudging him there at the end to keep him awake. This is obviously technical . . . testimony, but all testimony is critical and this juror has now missed out chunks of it, and I don't know that you can get that back. The only way he will be able to judge this testimony at this point is have another juror tell him what she testified to and that is absolutely inappropriate.

Thereafter, the circuit court brought Juror 1 to chambers to question him about the sleeping. The following colloquy took place:

THE COURT: I've got a couple of questions to ask you because I was a little bit concerned if you're getting drowsy up there.

JUROR [1]: Okay.

THE COURT: Were you getting a little drowsy?

JUROR [1]: I might have been.

. . . .

THE COURT: Now, do you feel like you've picked up everything so far?

JUROR [1]: Yes, I have.

THE COURT: Can you—do you remember what this stuff was we were just going through? It's kind of technical.

JUROR [1]: It was real technical, yes.

THE COURT: But have you taken notes?

JUROR [1]: Yes, I have.

THE COURT: You don't think you've . . . missed anything?

JUROR [1]: Not really.

THE COURT: [D]id one of your fellow jurors nudge—kneed you, bump you a while ago to—

JUROR [1]: A little bit. Yes, she did.

After Juror 1 left the chambers, counsel for Appellant reiterated her concern that the juror had dozed off and missed some testimony and, alternatively, asked the court to be aware of the fact that he appeared to be dozing. The circuit court announced that he was not going to dismiss him from the jury panel but advised all parties to continue to watch him. Thereafter, the trial resumed with Appellant cross-examining State's witness Chantelle Taylor, with the Arkansas State Crime Lab, regarding forensic analysis of evidence recovered in this case. Shortly thereafter the State rested, and Appellant renewed prior objections he had raised, including his objection to the sleeping ju-

ror. Counsel for Appellant specifically argued,

[W]e also ... had an issue about a juror who seemed to have some difficulty in keeping awake, and I want to just make the record on that. As I understand it, the bailiff even got concerned enough to take water to that juror. At this point, we would ask that juror be replaced by alternate number one. We discussed that in chambers when it happened. Uh, I think that the record should be clear that there was sufficient concern about that juror that he ... was not able to pay sufficient attention, especially during some fairly technical scientific testimony and that record was made previously.

The circuit court denied the motion with regard to removing the juror, indicating that he had seen nothing else from the juror that caused concern.

This court addressed whether an issue of juror misconduct related to a sleeping juror was preserved for appeal in *Carter v. State*, 324 Ark. 395, 921 S.W.2d 924 (1996). There, the appellant moved for a new trial on the basis that his case was decided by eleven jurors, where one of the jurors was sleeping. This court held that the juror-misconduct issue was not preserved for appeal. The court in *Carter* held that "a claim of jury misconduct raised for the first time in a motion for new trial be accompanied by an affirmative showing that the defense was unaware of the misconduct until after the trial." *Id.* at 403, 921 S.W.2d at 928 (quoting *Oliver v. State*, 322 Ark. 8, 20, 907 S.W.2d 706, 713 (1995)). In determining that the appellant could not sustain his burden of demonstrating juror misconduct, this court explained that the defense was aware of the sleeping juror and did nothing to correct the situation and, thus, the issue was not preserved for appeal.

Here, as opposed to *Carter*, Appellant's counsel notified the circuit court during the trial that she had noticed a juror sleeping. Counsel put the court on notice that she was concerned that the juror had slept through some technical testimony and there was no way for that juror to recoup that testimony. And, again, after the court called the juror to chambers and the juror stated that he had not missed much, Appellant's counsel reiterated her concern that he had missed some technical testimony. Nonetheless, the court held that the juror would remain on the panel. And, again, after the State rested its case, Appellant's counsel asked that the juror be removed based on the fact that he had fallen asleep and missed testimony. The circuit court denied this request. It is apparent to us that Appellant properly raised a challenge to the juror's sleeping and obtained a ruling on the request for the juror to be removed. Accordingly, the issue is properly preserved for our review.

Turning to the merits of this argument, this court has held that following an allegation of juror misconduct, the moving party bears the burden of proving both the misconduct and that a reasonable possibility of prejudice resulted from it. *Holsombach v. State*, 368 Ark. 415, 246 S.W.3d 871 (2007); *Henderson v. State*, 349 Ark. 701, 80 S.W.3d 374 (2002); *State v. Cherry*, 341 Ark. 924, 20 S.W.3d 354 (2000). We will not presume prejudice in such situations. *Cherry*, 341 Ark. 924, 20 S.W.3d 354. The moving party must show that the alleged misconduct prejudiced his chances for a fair trial. *Id.; Trimble v. State*, 316 Ark. 161, 871 S.W.2d 562 (1994). Whether unfair prejudice occurred is a matter for the sound discretion of the circuit court. *Butler v. State*, 303 Ark. 380, 797 S.W.2d 435 (1990).

This court addressed the issue of a sleeping juror in *Dolan v. State*, 40 Ark. 454 (1883), where the appellant argued that he was entitled to a new trial because a juror fell asleep during closing arguments. In support of his motion, the appellant attached affidavits from two of his attorneys, stating that they noticed the presiding judge direct another juror to wake up the sleeping juror. At a hearing on the motion for new trial, the juror was questioned by the court about whether he was sleeping, and the juror stated that he only dozed off for about a half of a minute. The motion for new trial was denied, and this court affirmed. Specifically, this court found that the allegation of juror misconduct was not grounds for a new trial, stating "it seems that not much of the eloquence of the learned advocate was wasted upon the drowsy juror." *Id.* at 463; *see also Pelham v. Page*, 6 Ark. 535 (1846) (holding new trial not warranted on the basis that one of the jurors was, to all appearance, asleep during a portion of the trial).

We most recently addressed the sleeping-juror issue in *Henderson v. State*, 349 Ark. 701, 80 S.W.3d 374 (2002). There, the appellant appealed the denial of his motion for new trial based on an allegation of juror misconduct. He argued that the circuit court erred in denying his motion for new trial, which alleged that as many as three jurors dozed off and on during the trial. To support his contention, Henderson offered affidavits and testimony from his sister and his mother that these jurors slept or dozed periodically throughout the trial. Both indicated that they did not notify Henderson's attorney or the circuit court about this problem until after the trial was over. Henderson argued that this juror misconduct presented a reasonable possibility of prejudice in that twenty-five percent of the jurors were not paying attention at various times during trial. This court affirmed the denial of the motion for new trial, finding that the appellant failed to sustain his burden of making an affirmative showing that the defense was unaware of the misconduct until after trial and that this misconduct prejudiced his chances for a fair trial.

These prior cases are distinguishable from the case at hand. They either involved a juror who dozed off for just a minute or involved a case where the trial court was not put on notice of a sleeping juror until after the trial was over. Here, counsel notified the court of the sleeping juror in a timely fashion. Specifically, counsel notified the court that the juror had been dozing for at least five minutes, such that the judge sent him a cup of water and another juror nudged him to wake him up. The court was allowed to question the juror about all of this, and then seemingly relied on the juror's assertion that he did not miss much in deciding to allow the juror to remain on the panel. A juror who was asleep for at least five minutes has no way of knowing what he may have missed during the presentation of the evidence. And, contrary to the State's position at oral argument of this matter, it is not acceptable for a juror to doze off, as long as the juror hears the "vast majority" of the evidence. In this instance, the court, having noticed the juror sleeping and having Appellant object to the juror's continued presence on the panel, could have easily substituted one of the alternates for the sleeping juror. While this is a matter within the sound discretion of the circuit court, under the facts of this case, the circuit court abused that discretion in not removing Juror 1. Accordingly, we reverse and remand Appellant's conviction and sentence. Nevertheless, we will discuss the remaining issue of juror misconduct, as well as the remain-

ing points on appeal, because of the likelihood that they may arise again.

We now turn to the issue of juror misconduct based on the juror tweeting during trial. Counsel for Appellant notified the circuit court that a juror (hereinafter referred to as "Juror 2") had been posting messages on his Twitter account during the trial. Counsel explained that during the noon hour on the day that all evidence was submitted in the sentencing phase, Juror 2 tweeted "Choices to be made. Hearts to be broken. We each define the great line." Counsel for Appellant argued that this tweet seemed to be a comment about the proceedings, particularly when it was tweeted immediately after the close of the State's rebuttal case. Moreover, counsel for Appellant argued that it was a flagrant violation of the circuit court's instruction against Twittering and demonstrated that Juror 2 could not follow the court's instructions. Finally, counsel for Appellant pointed out that one of the people following Juror 2's tweets was a reporter, with a Twitter account identified as Ozark Unbound. Thereafter, the court questioned Juror 2 as follows:

THE COURT: Now, it has been brought to my attention that during—during the course of the trial that you have from time to time, uh, twittered, whatever that is. Have you?

JUROR [2]: Um, I twittered like day three in court or, you know, something about—not necessarily the case but just the time link about the court.

THE COURT: All right. But you haven't—

JUROR [2]: Not discussed any of the case.

THE COURT: Well, I want to ask you about a specific twitter and, uh, I want you to think about it and then tell me what it means.

JUROR [2]: Okay.

THE COURT: Okay. It's says: Choices to be made. Hearts to be broken. We each define the great line. About 20 hours ago via text. Now what does that mean?

JUROR [2]: Well, I'm a little shocked. That's a little creepy. But, uh, it means, um—

THE COURT: Would you prefer to come up here to the bench?

JUROR [2]: Yeah. Um, what it means—oh, wait. You want me to come up there?

THE COURT: I was gonna bring you up here if you're—

JUROR [2]: I can say it.

THE COURT: Okay, go ahead.

JUROR [2]: I'm not having trouble.

THE COURT: All right.

JUROR [2]: What it means was, um, not only like to pertain to this case but also to future stuff. Um, obviously, whatever we as a jury decide—you know, I'm not necessarily saying I know what's going to be decided, but we have to decide—make a huge decision. Either way, you know, if we do decide something like it's just gonna—a lot of people are either going to be mad about it watching the news because, you know, people have expressed to me you're on that court case, right? I can't talk about it. So I leave. So there's a ton of people watching this. And either way we decide, people are either going to be angry or people are going to be hurt either way. So what I was meaning by that was, you know, we have to define the great line of, you know, where we stand on a subject and, you know, what we have to choose—decide in the future. And also "Define the Great Line" was an Underoath album, and I thought I'd throw that in there along with my tweet.

THE COURT: Well, have you already made up your mind in this case what you're going to—how you're going to vote?

JUROR [2]: No, because I'm waiting for the other 11 to help me come to a conclusion.

THE COURT: All right.

JUROR [2]: But I'm trying to prepare myself just because you know, um, the death penalty or even this case is a little uncomfortable just because, um, I have not seen death in my life, like, firsthand. So the talk of death is a little uncomfortable just because it's an unknown—it's an unknown area for me.

THE COURT: All right. Mr. Stone, do you have any questions of [Juror 2]?

MR. STONE: No, I don't.

THE COURT: Ms. Streett?

MS. STREETT: No, sir.

THE COURT: All right, have—now, have you followed the Court's instructions about not discussing the particulars of this case with anybody?

JUROR [2]: Yes, sir.

THE COURT: Okay.

After Juror 2 was questioned by the circuit court, counsel for Appellant expressed concern that the misconduct resulted from the fact that in order for a juror to be qualified to sit on a panel he or she must be able to follow the instructions of the court. Specifically, counsel stated the following:

This court told them not to tweet about this case. That is the problem. He did. This is a death penalty capital murder case, and we have a juror who has now flagrantly disregarded this court's instructions. That disqualifies him.

The court disagreed, however, ruling that even though the juror admitted to disregarding the instruction not to tweet, it was not a "material breach of my instruction or

of his oath." Thus, the court refused to strike Juror 2 from the panel.

More troubling is the fact that after being questioned about whether he had tweeted during the trial, Juror 2 continued to tweet during the trial. Once counsel for Appellant learned of this they moved for a new trial, arguing that this was further evidence of the juror's inability to follow the court's directives such that it constituted juror misconduct. In his motion for new trial, Appellant stated that Juror 2 tweeted two different times on April 1, 2010, during the time the jury was deliberating in the sentencing phase. Specifically, at 1:27 p.m., Juror 2 tweeted: "If its wisdom we seek . . . We should run to the strong tower." Then, again at 3:45 p.m., he tweeted, "Its over." But, the jury did not announce that it had reached a sentence until 4:35 p.m. The circuit court denied Appellant's motion for new trial, finding that Appellant suffered no prejudice.

Here, we have a situation where a juror admitted that he disregarded the circuit court's instruction not to tweet about the case. And, even after the juror was questioned, admitted to the misconduct, and was again admonished not to discuss the case, he continued to tweet, specifically during sentencing deliberations. Moreover, not only did the judge specifically instruct the jurors not to tweet at the beginning of the trial, each time the court took a recess, it instructed the jurors not to discuss the case with anyone. Specifically, the jury was repeatedly instructed to pay attention to all of the evidence, not to deliberate until all the evidence was presented, and not to discuss the case with anyone. More significantly, the circuit court instructed the jury prior to opening statements:

When you're back in the jury room, it's fine with me to use your cell phone if you need to call home or call business.

Just remember, never discuss this case over your cell phone. *And don't Twitter anybody about this case. That did happen down in Washington County and almost had a, a $15 million law verdict overthrown. So don't Twitter. Don't use your cell phone to talk to anybody about this case other than perhaps the length of the case or something like that.* (Emphasis added.) And, again, each time the court went into recess, the circuit court would remind the jurors not to discuss the case with anyone.

Because of the very nature of Twitter as an on online social media site, Juror 2's tweets about the trial were very much public discussions. Even if such discussions were one-sided, it is in no way appropriate for a juror to state musings, thoughts, or other information about a case in such a public fashion. As the Third Circuit Court of Appeals recognized,

> If anything, the risk of such prejudicial communication may be greater when a juror comments on a blog or social media website than when she has a discussion about the case in person, given that the universe of individuals who are able to see and respond to a comment on Facebook or a blog is significantly larger.

*United States v. Fumo,* 655 F.3d 288, 305 (3d Cir.2011). Notably, even though it recognized the potential dangers in a juror communicating on a social media site, the Third Circuit ultimately affirmed the lower's court denial of the defendant's motion for a new trial, finding that the juror's statements were vague and "harmless ramblings" that were not sufficient proof of juror misconduct that resulted in prejudice to the defendant. *Id.* at 306.

In fact, in cases where courts have declined to find prejudicial juror misconduct, the general consensus is that jurors are presumed to be unbiased to follow court's instructions. *See Martin v. Royse,* No. 1:08–cv–246, 2010 WL 2521063 (N.D.Ind. June 11, 2010); *State v. Dellinger,* 225 W.Va. 736, 696 S.E.2d 38 (2010). Each of the foregoing cases is distinguishable, however. First, the procedural posture of this case is not that Appellant was prejudiced by the fact that the juror tweeted; rather, Appellant avers the prejudice results from the fact that the juror admitted to the misconduct, which proves that he failed to follow the court's instructions, and it is the failure to follow the law that prejudiced Appellant. Although this is an issue of first impression for this court, it should be noted that our Administrative Order No. 6 was amended on May 27, 2010, and includes the following provision:

> (7) Electronic devices shall not be used in the courtroom to broadcast, record, photograph, e-mail, blog, tweet, text, post, or transmit by any other means except as may be allowed by the court.

Thus, this court has recognized the importance that jurors not be allowed to post musings, thoughts, or any other information about trials on any online forums. The possibility for prejudice is simply too high. Such a fact is underscored in this case, as Appellant points out, because one of the juror's Twitter followers was a reporter. Thus, the media had advance notice that the jury had completed its sentencing deliberations before an official announcement was made to the court. This is simply unacceptable, and the circuit court's failure to acknowledge this juror's inability to follow the court's directions was an abuse of discretion.

This court recognized in *Cherry,* 341 Ark. 924, 20 S.W.3d 354, that a defendant is entitled to a fair trial, not a perfect trial. There, we determined that Cherry was denied a fair trial when it came to light that jurors had prejudged his guilt

and, thus, had failed to follow the court's instructions. Likewise, Appellant was denied a fair trial in this case where Juror 2 disregarded the circuit court's instructions and tweeted about the case and Juror 1 slept through part of the trial.

Finally, we take this opportunity to recognize the wide array of possible juror misconduct that might result when jurors have unrestricted access to their mobile phones during a trial. Most mobile phones now allow instant access to a myriad of information. Not only can jurors access Facebook, Twitter, or other social media sites, but they can also access news sites that might have information about a case. There is also the possibility that a juror could conduct research about many aspects of a case. Thus, we refer to the Supreme Court Committee on Criminal Practice and the Supreme Court Committee on Civil Practice for consideration of the question of whether jurors' access to mobile phones should be limited during a trial.

Even though we are reversing and remanding on the issue of juror misconduct, we will address the remainder of Appellant's arguments to the extent they are likely to arise on remand.

### III. *Evidence of Aggravating Circumstance*

For his third point, Appellant argues that the circuit court erred in allowing the State to introduce evidence related to an uncharged felony; specifically, a shooting that occurred at the Casa Torres nightclub during the sentencing phase of his trial. According to Appellant, the law is in a state of flux as to whether an aggravator should be submitted to the jury on the "slight" rather than the "substantial" evidence standard. Appellant urges that, in this instance, the State sought to introduce evidence of an uncharged, unconvicted fel-

ony in which the only evidence of Appellant's involvement came from a witness who had already admitted to lying under oath. The State counters that the circuit court did not err in admitting the evidence after finding that there was substantial evidence that Appellant had committed a prior violent felony. Moreover, the State asserts that Appellant prevailed on this issue as the jury found that there was not substantial evidence of the Casa Torres incident to support a finding that it was an aggravating circumstance.

At the outset, we agree with the State that Appellant cannot demonstrate that the admission of the Casa Torres incident constituted reversible error where, as here, the jury did not find that this constituted an aggravating circumstance when it deliberated punishment. Moreover, the jury found two other aggravating circumstances in imposing a sentence of death. This court has recognized that only one aggravating circumstance need be present for a jury to impose the death penalty in a capital-murder case. *Dansby v. State*, 319 Ark. 506, 893 S.W.2d 331 (1995). Nevertheless, we take this opportunity to clarify the law regarding the evidentiary standard for submitting an aggravating circumstance to the jury.

Arkansas Code Annotated section 5–4–602 (Supp.2009) governs procedure in a capital-murder trial and provides in relevant part as follows:

> (4)(A) If the defendant and the state are accorded an opportunity to rebut the evidence, in determining the sentence evidence may be presented to the jury as to any:
>
> > (i) Matter relating to an aggravating circumstance enumerated in § 5–4–604;
>
> > . . . .

(C) The admissibility of evidence relevant to an aggravating circumstance set forth in § 5–4–604 is governed by the rules governing the admission of evidence in a trial of a criminal matter.

An aggravating circumstance as set forth in Arkansas Code Annotated section 5–4–604(3) (Supp.2009) includes a previously committed felony, an element of which was the use or threat of violence to another person or the creation of a substantial risk of death or serious physical injury to another person.

■ This court has previously addressed the issue of what quantum of proof is required before the State is allowed to submit an aggravator to the jury. In *Willett v. State,* 335 Ark. 427, 437–38, 983 S.W.2d 409, 413–14 (1998), this court noted the following:

> Appellant contends that by allowing the jury's consideration of those aggravating and mitigating circumstances for which there is some evidence, however slight, that we have unconstitutionally modified our requirement for substantial evidence to establish an aggravating circumstance beyond a reasonable doubt. This argument stems from our decision in *Miller v. State,* 269 Ark. 341, 605 S.W.2d 430 (1980). In *Miller,* we considered the problems inherent in the widespread practice by trial courts of submitting to the jury during the sentencing phase all mitigating and statutory aggravating factors whether or not there was any evidence to support them, and expressed our view that the better practice would be to only submit for the jury's consideration those aggravating and mitigating factors for which there is any evidence, however slight. *Id.* We noted that each of the jury's findings as to the existence of aggravating and mitigating circumstances was not a separate little verdict and also made the observa-

tion, upon which we did not rely, that "we do not require the same degree of proof to sustain a jury finding that an aggravating or mitigating circumstance exists as we would require to sustain a conviction if that circumstance was a separate crime." *Miller,* 269 Ark. at 355, 605 S.W.2d at 439. That statement is not correct with respect to the degree of proof required by a jury to support an aggravating circumstance which must be found to exist beyond a reasonable doubt to justify a sentence of death.

> In *Miller,* we reviewed the jury's findings of aggravating circumstances justifying the imposition of the death sentence and applied the correct standard of review. We found that "there was sufficient evidence for the jury to find beyond a reasonable doubt that appellant killed the deceased to eliminate a witness and thus hopefully avoid arrest...." *Id.* The United States Court of Appeals for the Eighth Circuit pointed out that the language in *Miller* was flawed, but concluded that we had followed a correct standard of review. *Miller v. Lockhart,* 65 F.3d 676, 686–87 (8th Cir.1995). In our later cases we have restated the standard that we will "review the sufficiency of the State's evidence in the light most favorable to the State to determine whether any rational trier of fact could have found the existence of the aggravating circumstance beyond a reasonable doubt." *Kemp v. State,* 324 Ark. [178, 200], 919 S.W.2d [943, 953 (1996)]. We do not change the rule established in *Miller* which allows the jury to consider those mitigating and statutory aggravating circumstance for which evidence, however slight, exists. However, we will continue to review all findings relating to aggravating circumstances which support the imposition of a death penalty to determine whether there existed sub-

stantial evidence for the jury to find beyond a reasonable doubt that one or more aggravating circumstances existed, that the aggravating circumstances outweighed the mitigating circumstances beyond a reasonable doubt, and that the aggravating circumstances justified a sentence of death beyond a reasonable doubt.

*Willett* is not an anomaly. This court has repeatedly held that whenever there is evidence of an aggravating or mitigating circumstance, however slight, the matter should be submitted to the jury for consideration. *See Wertz v. State,* 374 Ark. 256, 287 S.W.3d 528 (2008); *Roberts v. State,* 352 Ark. 489, 102 S.W.3d 482 (2003). But, once the jury has found that an aggravating circumstance exists beyond a reasonable doubt, this court may affirm only if the State has presented substantial evidence in support of each element therein. *E.g., Williams v. State,* 347 Ark. 728, 67 S.W.3d 548 (2002); *Greene v. State,* 335 Ark. 1, 977 S.W.2d 192 (1998). Substantial evidence is that which is forceful enough to compel reasonable minds to reach a conclusion one way or the other and permits the trier of fact to reach a conclusion without having to resort to speculation or conjecture. *See Greene,* 335 Ark. 1, 977 S.W.2d 192.

We now recognize the inherent inconsistency of our position in *Willett* and its progeny. The reasoning adopted by the dissent in *Willett* is more consistent with the proper evidentiary threshold required for submission of an aggravator. There, the dissent explained as follows:

There is one final statement in the majority's discussion of this point that I find troublesome. The majority correctly holds that a jury's finding that an aggravating circumstance exists beyond a reasonable doubt must be supported by "substantial evidence." It suggests, however, relying on language in the 1980 *Miller* case, that a trial court may submit an aggravating circumstance to the jury if the State introduces "any evidence, however slight," in support of the aggravating circumstance.

The "substantial evidence" standard clearly requires a greater quantum of proof than the "any evidence, however slight" standard. The problem with the majority's suggestion, then, is obvious. A rule allowing a trial court to submit an aggravating circumstance to the jury upon a lower evidentiary threshold, such as "any evidence, however slight," will always result in a reversal if a jury finds the existence of an aggravating circumstance when the evidence supporting the aggravating circumstance is anything less than "substantial." Thus, if this Court is to apply the "substantial evidence" standard in reviewing the sufficiency of the evidence supporting a jury's finding that an aggravated circumstance exists, then that is the standard that a trial court should apply in determining whether to submit an aggravating circumstance to the jury. For the sake of judicial economy, a trial court should not submit an aggravating circumstance to the jury unless there is substantial evidence, not merely slight evidence, in support of it.

*Id.,* 335 Ark. at 442–43, 983 S.W.2d at 416–17 (Newbern, J., dissenting).

The instant case perfectly illustrates the problem recognized by the dissent in *Willett.* Here, the State was allowed to introduce evidence during sentencing that Appellant committed a prior, violent felony, i.e., the shooting at Casa Torres that constituted an aggravating circumstance. The only evidence to support this was the testimony from Magana–Palma that Appellant told him that he had committed the shooting. This

evidence was contrary to the testimony of two officers that another person, Gonzolo Garcia, identified the shooter (immediately after the incident) as "Franklin." At the conclusion of the sentencing phase, Appellant argued that the State had failed to specify any particular felony that Appellant allegedly committed and that would satisfy the facts as presented. The court nevertheless suggested the State submit an instruction "as to what is a felony," such as for "aggravated assault, attempted murder, battery." Ultimately, the circuit court instructed the jury that "[a]ggravated assault is a felony" and stated the elements of the crime. This was error, even if it was not prejudicial to Appellant.

■■■ For purposes of clarity, we will no longer follow the "however slight" standard utilized in *Willett* and its progeny. The appropriate standard that a circuit court should apply in determining whether to submit an aggravating circumstance to the jury is that of substantial evidence, the same standard employed by an appellate court on review.

## IV. *Admission of Other Evidence*

Appellant next argues that the circuit court erred in allowing the State to introduce evidence of unrelated bad acts, weapons, and ammunition. Specifically, Appellant argues that it was error for the circuit court to introduce the testimony of Fayetteville Police Officer Kenn Willyard that he conducted a traffic stop of Appellant a month before the murder and discovered a loaded .380 magazine clip on his person, as this evidence was not relevant and was more prejudicial than probative. Appellant also argues that it was error for the court to admit a .380 Talon handgun where the gun was never linked to these crimes. Finally, Appellant argues that testimony from Magana–Palma and Edwin

Mancia that they had previously lied under oath because they were fearful of Appellant's friends was inadmissible as it was highly inflammatory and prejudicial. The State counters that none of these allegations constitute reversible error as the admission of evidence is within the sound discretion of the circuit court.

■■■ Rule 404(b) provides that

[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Ark. R. Evid. 404(b) (2011). The admission or rejection of evidence under Rule 404(b) is committed to the sound discretion of the circuit court, and this court will not reverse absent a showing of manifest abuse of discretion. *Camp v. State*, 2011 Ark. 155, 381 S.W.3d 11; *Lamb v. State*, 372 Ark. 277, 275 S.W.3d 144 (2008). It is well settled by this court that testimony of other criminal activity is admissible "if it is independently relevant to the main issue, that is, relevant in the sense of tending to prove some material point rather than merely to prove that the defendant is a criminal." *Green v. State*, 365 Ark. 478, 494, 231 S.W.3d 638, 651 (2006). In other words, the evidence offered under Rule 404(b) must make the existence of any fact of consequence more or less probable than it would be without the evidence. *Id.* When evidence of another crime or wrong reflects consciousness of guilt of the commission of the crime charged, it is independently relevant and admissible under Rule 404(b). *E.g., Banks v. State*, 2010 Ark. 108, 366 S.W.3d 341.

Rule 403 provides that "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Ark. R. Evid. 403 (2011). This court has noted that evidence offered by the State in a criminal trial is likely to be prejudicial to the defendant to some degree, otherwise it would not be offered. *Vance,* 2011 Ark. 243, 383 S.W.3d 325; *Rounsaville v. State,* 2009 Ark. 479, 346 S.W.3d 289. Nevertheless, the evidence should not be excluded under Rule 403 unless the defendant can show that the evidence lacks probative value in view of the risk of unfair prejudice. *Rounsaville,* 2009 Ark. 479, 346 S.W.3d 289. This court reviews a circuit court's ruling under Rule 403 for an abuse of discretion. *Id.*

First, we review the admissibility of the ammunition clip. Officer Willyard testified that he stopped Appellant for speeding on November 24, 2006, more than a month before the shooting of Jefferson. At that time, Willyard conducted a pat-down search and discovered the loaded .380 clip, which he returned to Appellant at the conclusion of the stop. Appellant argued that it was not admissible as it was not relevant to the murder and robbery of Jefferson and was more prejudicial than probative. But, the circuit court allowed it as evidence that Appellant had the opportunity to access the same type of ammunition that was later used in the murder of Jefferson.

The circuit court's ruling was based on this court's decision in *Banks,* 2010 Ark. 108, 366 S.W.3d 341. In that case, this court affirmed the circuit court's admission of a variety of ammunition recovered during a search of a room where the appellant's accomplice was staying. This court

ruled that it was admissible as evidence of opportunity, explaining that

[t]estimony was presented by the State that twelve 7.62 by 39 shell casings, twenty-two nine-millimeter, and eight .40–caliber shell casings had been collected from the scene of the drive-by shooting, which resulted in Kamya's death. The same, exact types of ammunition were found at Banks's former home, in the bedroom of his half-brother, an alleged accomplice to the shooting. Such was relevant evidence relating to Banks's and his alleged accomplices' knowledge of those types of ammunition and access thereto. The fact that the exact same types of ammunition used in the shooting were found at the home of Banks and his alleged accomplices was relevant to his or his accomplices' guilt.

*Id.* at 5–6, 366 S.W.3d at 344.

Just as in *Banks,* the evidence of the gun clip with .380 ammunition was relevant to establish that Appellant had access to the type of ammunition used in Jefferson's murder. Moreover, while this evidence may have been prejudicial to Appellant, its probative value outweighed the danger of unfair prejudice. Accordingly, we cannot say the circuit court abused its discretion in admitting the evidence related to the gun clip.

Next, we must look at the admissibility of the gun that police recovered from Edwin Mancia. Mancia told authorities that Appellant contacted him and told him that his co-defendant was in trouble and that he needed Mancia to retrieve a gun from Magana–Galdamez's house. Mancia did as requested but then turned the gun, a .380–caliber handgun, over to authorities. The gun was sent to the State Crime Lab, but the analysts could not conclusively determine that it was the gun that had fired the shot that killed Jefferson. It is the fact

that the gun could not be tied to the murder that Appellant asserts makes it irrelevant and highly inflammatory. In support of his argument, Appellant cites us to *Rush v. State*, 238 Ark. 149, 379 S.W.2d 29 (1964), where this court held that a pistol not linked to the crime was not properly admitted into evidence. In so ruling, this court noted that the very fact that the pistol was admitted into evidence could have had a tendency to confuse the jury, even though the State did not contend it was the murder weapon.

The decision in *Rush* is distinguishable from the instant case. There, ballistics tests confirmed that the gun introduced at trial was not the murder weapon, while the forensic testing on the gun recovered from Mancia was inconclusive. More importantly, the gun in this case was introduced during Mancia's testimony, wherein he stated that Appellant had contacted him and specifically asked him to retrieve the gun, which happened to be the same caliber handgun as that used in the murder, from his accomplice's house. We agree with the State that this evidence demonstrated that it was more probable than not that Appellant had access to a .380–caliber weapon at the time of Jefferson's murder. *E.g., Bohanan v. State*, 324 Ark. 158, 919 S.W.2d 198 (1996) (holding that introduction of bullets and casings known to belong to the defendant were relevant because it made it more probable than not that the defendant had access to a .45–caliber weapon at the time of the murder); *see also Banks*, 2010 Ark. 108, 366 S.W.3d 341 (allowing admission of these types of ammunition that were the same caliber as that used in a prior murder). This court has also recognized that any circumstance that links a defendant to the crime or raises a possible motive for the crime is independently relevant and ad-

missible under Rule 404(b). *Creed v. State*, 372 Ark. 221, 273 S.W.3d 494 (2008).

Again, we cannot say that the circuit court abused its discretion in finding that the gun was relevant evidence and that its probative value outweighed the possibility of any unfair prejudice. In any event, Appellant cannot demonstrate prejudice, as the jury was given a proper Rule 404(b) limiting instruction that evidence of other alleged crimes, wrongs, or acts was merely offered as evidence of opportunity, among other things, not as proof of his character. We have observed that a limiting instruction by the court may serve to remove the prejudicial effect of evidence. *Williams v. State*, 2011 Ark. 432, 385 S.W.3d 157.

Finally, Appellant cannot demonstrate error with regard to the testimony of Mancia and Magana–Palma that they had previously lied under oath because of fear of Appellant's friends. Appellant opened the door to this testimony when he challenged the credibility of these witnesses by pointing out that they had prior inconsistent statements. An appellant cannot demonstrate prejudice when he opens a door to the testimony in the first place. *E.g., Eubanks v. State*, 2009 Ark. 170, 303 S.W.3d 450.

## V. State's Second Mental Evaluation of Appellant

Finally, Appellant argues that the circuit court erred in allowing the State to pursue a second mental examination of Appellant after the State's witness, Dr. George Mallory, admitted to scoring errors in his evaluation of Appellant. Further, Appellant asserts that once Dr. Mallory's opinion was discredited, the only evidence remaining for the court to consider was Appellant's expert's opinion that Appellant was mentally retarded and, as such, it was error for the court to deny his motion to bar the death penalty pursuant to *Atkins v.*

*Virginia,* 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002). This error, according to Appellant, was compounded by the fact that the court required him to undergo another State-imposed evaluation in violation of his right to remain silent under both the state and federal constitutions.

The issue of mental retardation was raised by Appellant prior to trial. Appellant retained Dr. Ricardo Weinstein as an expert who then performed several tests on Appellant to determine his IQ. Dr. Weinstein also studied Appellant's history in order to determine whether there was any evidence of adaptive-functioning deficits, which is also necessary to reach a conclusion on the issue of mental retardation.

Testifying for the defense at a pretrial competency hearing, Dr. Weinstein stated that he administered a variety of tests, including tests aimed at determining whether Appellant might be malingering. The results from the three main tests each showed that Appellant has an IQ in a range of 64 to 77, according to Dr. Weinstein. In addition, Dr. Weinstein stated that he traveled to El Salvador, where Appellant resided until he was sixteen years of age, and interviewed various family members, the midwife who delivered Appellant, and school officials who had contact with him. Ultimately, Dr. Weinstein opined that

> [i]t is my opinion to a high degree of scientific certainty that Mr. Dimas–Martinez fulfills the definition of mental retardation according to DSM–IV–TR and the AAIDD. In addition, he suffers from significant brain dysfunction with particular compromise to the frontal lobe as a result of which his judgment and impulse control are severely affected. Furthermore, while intoxicated with any mind-altering substance, this condition would be greatly exacerbated.

Although Dr. Weinstein opined that Appellant was mildly, mentally retarded, Dr. Weinstein found Appellant competent to stand trial.

Dr. Charles Mallory testified on behalf of the State and stated that he had also administered certain tests and opined that there was no evidence of mental retardation, as Appellant's IQ was not 70 or below and his adaptive function did not support a diagnosis of mental retardation.

After this hearing, but before trial, this court handed down the decision in *Newman v. State,* 2009 Ark. 539, 354 S.W.3d 61, where we noted the following problems with Dr. Mallory's evaluation of Newman:

> Dr. Mallory acknowledged that the IQ test Dr. Weinstein administered, the Wechsler Adult Intelligence Scale–III ("WAIS–III"), is a very reliable test and the most widely used test in the world. However, Dr. Mallory instead administered the Wechsler Abbreviated Scale of Intelligence ("WASI") and the "Kent Test" to assess Newman's level of cognitive functioning. Newman contends that neither of these tests are appropriate for determining a person's IQ. Dr. Mallory acknowledged that the manual of the WASI specifically states that the instrument should not be used alone to make diagnoses and should not be used for legal or judicial purposes. In addition, Dr. Mallory acknowledged that the Kent Test was not a commercially available instrument, but a "homemade test that a psychiatrist once passed [him]." Dr. Mallory explained that the Kent Test consisted of ten questions, such as, "What is sand used for?" and "What are the names of some fish?" A person earns points for knowing answers to the questions. Dr. Mallory agreed that the Kent Test had not been shown to have any reliability or validity or to have any ability to accurately predict intellectual

functioning. Nevertheless, Dr. Mallory stated that, on the basis of Newman's score on the Kent Test, Newman had an average intellectual ability and there was no need for further intelligence testing.

Dr. Mallory admitted that he made a significant scoring error when he administered the WASI to Newman. Specifically, Dr. Mallory scored Newman's results using the norms for the wrong age group, erroneously inflating Newman's scores on all subparts of the test. Correctly scored, Newman's verbal IQ score was 80, rather than 84, as Dr. Mallory had reported; Newman's performance IQ score was 72, rather than 77; and his full scale IQ score was 75, not 78. Dr. Mallory indicated that a full-scale IQ score of 75 would necessitate a further investigation of Newman's cognitive function. Dr. Mallory admitted that he "certainly made a big error."

*Id.* at 8–9, 354 S.W.3d at 66–67. Because Dr. Mallory's flawed calculations and opinion were the only evidence introduced as to Newman's competency, this court granted him leave to reopen his case to pursue a writ of error coram nobis.

After our decision in *Newman,* Dr. Mallory sent a letter to the circuit court informing it that he had made errors in Appellant's testing as well. Specifically, Dr. Mallory stated that he made a calculation error that resulted in a full scale IQ of Appellant of 80, rather than an 81. But, Dr. Mallory stated that this calculation error did not change his forensic opinion that Appellant was not mentally retarded. Dr. Mallory subsequently changed his opinion, however, and opined that based on a scientific concept known as the "Flynn Effect," Appellant was borderline mentally retarded. This prompted Appellant to file a "Motion for Continuance and Notice of Intent to Seek Special Sentencing Provi-

sion of Mental Retardation Pursuant to Ark.Code Ann. § 5–4–618." Therein, Appellant stated that he had previously decided not to pursue the mental-retardation issue during sentencing but because of the change in Dr. Mallory's opinion, he now wanted to pursue the issue and to present evidence of mental retardation.

A hearing was held in which Dr. Mallory testified about his revised scoring and changed opinion regarding Appellant's IQ. Ultimately, the circuit court denied Appellant's request to reopen the issue of mental retardation. But, a few days later, the State filed a "Motion for Further Evaluation of the Defendant at the Arkansas State Hospital" based on its doubts about Dr. Mallory's qualifications. Appellant opposed the motion on the basis that the State was seeking a second opinion and was trying to "doctor shop." The court granted the motion, and Dr. Ron Faupel with the Arkansas State Hospital evaluated Appellant and opined that he was not mentally retarded.

Now, in support of his contention that the State should not have been allowed to seek a second opinion, Appellant cites us to *King v. State,* 317 Ark. 293, 877 S.W.2d 583 (1994). *King* is distinguishable from the instant case. There, this court ruled that a circuit court did not err in refusing the appellant's request for a second mental evaluation, where the appellant was not satisfied with the initial evaluation. That is not the situation that is presented here. In this instance, the State's only witness as to Appellant's mental retardation was discredited for calculation errors in another case just prior to Appellant's trial. That witness then admitted to calculation errors in this case, and subsequently changed his opinion altogether. Based on these facts, we cannot say that the circuit court erred in granting the State's request

that Appellant undergo a second evaluation at the State Hospital.

Moreover, Appellant cannot demonstrate how he was prejudiced by allowing the State to seek the second evaluation. He makes a conclusory statement that the second evaluation violated his right to remain silent. The problem with this is the fact that it was Appellant who wanted to avail himself of the statutory provision for special sentencing with regard to the mental-retardation issue. He could not avail himself of this provision, but then refuse an evaluation. It is well settled that this court will not presume prejudice, and none has been demonstrated in this instance. *Holt v. State*, 2011 Ark. 391, 384 S.W.3d 498.

VI. *Appellate Review Pursuant to Rule 4–3(i) and Rule 10*

The record in this case has been reviewed for reversible error pursuant to Arkansas Supreme Court Rule 4–3(i) (2011). We have, in addition, conducted a mandatory review of the record as required by Rule 10(b) of the Arkansas Rules of Appellate Procedure–Criminal and considered

(i) pursuant to Rule 4–3(h) of the Rules of the Supreme Court and Ark. Code Ann. § 16–91–113(a), whether prejudicial error occurred;

(ii) whether the trial court failed in its obligation to bring to the jury's attention a matter essential to its consideration of the death penalty;

(iii) whether the trial judge committed prejudicial error about which the defense had no knowledge and therefore no opportunity to object;

(iv) whether the trial court failed in its obligation to intervene without objection to correct a serious error by admonition or declaring a mistrial;

(v) whether the trial court erred in failing to take notice of an evidentiary error that affected a substantial right of the defendant;

(vi) whether the evidence supports the jury's finding of a statutory aggravating circumstance or circumstances; and

(vii) whether the sentence of death was imposed under the influence of passion, prejudice, or any other arbitrary factor.

Pursuant to this mandatory review, we have found no further errors.

Reversed and remanded.