

# Missouri Court of Appeals

### Southern District

### Division Two

J.T. AND A.T., BY AND THROUGH )
THEIR FATHER, JOHN TAYLOR, FOR )
THE DEATH OF THEIR MOTHER, )
LINDY TAYLOR, and )
J.T. AS PLAINTIFF AD LITEM, )
                              )
     Plaintiffs-Appellants, )
                              )
vs. )     No. SD32562
                              )
MARTIN ANBARI, M.D., )     **Filed: January 23, 2014**
LITTON & GIDDINGS RADIOLOGICAL )
ASSOCIATES, P.C., and )
MICHAEL WORKMAN, M.D., )
                              )
     Defendants-Respondents. )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

### Honorable Jason R. Brown, Associate Circuit Judge

### <u>AFFIRMED</u>

This is an appeal from a defense verdict in a medical malpractice case. J.T.

and A.T., by and through their father John Taylor (collectively, "the Taylors"),

filed a petition seeking damages for the death of the boys' mother, Lindy Taylor

("Mother"), from Martin Anbari ("Dr. Anbari"), Michael Workman ("Dr.

Workman"), and Litton & Giddings Radiological Associates, P.C. (collectively,

"the defendants"). The case went to trial, and the jury returned a verdict for the

defendants.  The Taylors appeal, raising three points involving the selection of the jury and alleged juror misconduct.  We affirm the trial court's judgment.

### Factual and Procedural Background

On September 18, 2009, the Taylors filed their petition against the defendants alleging the defendants' negligence caused Mother's death.  The petition stated that in 2008, Mother was hospitalized for a deep vein thrombosis in her left leg.  While she was being treated for that condition, Dr. Anbari allegedly failed to diagnose May-Thurner Syndrome.  Mother was subsequently released from the hospital, and the deep vein thrombosis returned.  Mother was hospitalized a second time.  During her second hospitalization, the defendants treated Mother with anticoagulants which caused a cerebral bleed.  Mother died on June 13, 2008.

The case was tried by a jury which found in favor of the defendants.  The Taylors filed a motion for new trial in which they alleged, among other things:  (1) Juror Randall Doennig ("Doennig") "engaged in serious juror misconduct by violating [the c]ourt's explicit instruction prohibiting jurors from communicating or posting *anything* about the trial on Facebook[;]" (2) the trial court erred in denying the Taylors' *Batson*[1] challenge to the defendants' peremptory strike of Venireperson Sonja Howard ("Howard"); and (3) Juror Barbara Gurley ("Gurley") "failed to disclose during voir dire that both she and her late-husband had arterial stents."  The trial court heard argument and evidence on the motion before denying it.  This appeal followed.

---

[1] *Batson v. Kentucky*, 476 U.S. 79 (1986)

## Discussion

### *Point I:  Batson Challenge*

In their first point, the Taylors argue the trial court erred in denying their *Batson* challenge to the defendants' peremptory strike of Howard.  This argument is without merit because the Taylors failed to prove the reasons for the strike were pretextual.

The following additional facts are relevant to this claim.  During the first portion of voir dire, the trial court asked the panel members to state their employment, their marital status, whether they had children, and how long they had lived in Greene County.  Howard responded she was divorced, she had lived in Springfield for 13 years, she had four children, and she was pursuing a paralegal degree.  Later, while the Taylors' attorney was questioning the venire panel, the Taylors' attorney asked if anyone believed a doctor had saved his or her life or the life of a family member.  Howard gave the following response:

> In 2010 I was diagnosed with pneumonia.  I was a patient in Cox
> Medical Hospital on the south side.  I was very, very ill.  During my
> stay there, I ended up with a blood clot in my right arm because
> they couldn't get an IV, you know, in the regular way, so they had to
> do this deal.  I was a very, very sick woman.  Wasn't getting any
> better.  I was there probably about three to four weeks and didn't
> look too good for me.  The doctors that were on my team really
> fought for my life.  I mean, basically they did everything they could
> do.  Turned the entire situation around.  Here I am.

After the parties had made their peremptory strikes, the Taylors' attorney announced he wanted to challenge the defendants' strike of Howard.  He identified Howard as the only African-American on the panel and stated he objected to the strike on the basis of a *Batson* challenge.  Dr. Anbari's attorney responded:

3

First of all, there are no minorities involved in the case, so I think a Batson challenge is silly to begin with, but the reason that she was stricken has nothing to do with the color of her skin. It has to do with her being very similar to [Mother]. She is a single mother. She has had blood clots, and, in fact, she describes being in the hospital with blood clots and having a difficult time with it. That was the reason why the defendants used a peremptory cause [sic] on her. Nothing to do with regards to the color of her skin.

Dr. Workman's attorney agreed and added he was also concerned because Howard was a paralegal. The Taylors' attorney replied the reasons were pretextual, stating "[t]here were plenty of other jurors, Your Honor, that were single mothers that they did not strike. There were others with legal experience that they did not strike. And this lady even talked about a doctor that fought for her life." The trial court found the defendants' explanation was nondiscriminatory and denied the *Batson* challenge. That ruling was not clearly erroneous.

The standard of review that applies to the claim the Taylors raise in this point is deferential: "The trial court's determination regarding purposeful discrimination is a finding of fact that will not be overturned on appeal unless clearly erroneous." *State v. Brooks*, 960 S.W.2d 479, 488 (Mo. banc 1998). Clear error is found where the appellate court is left with a definite and firm impression that a mistake has been made. *Id.* Furthermore, in reviewing *Batson* challenges, appellate courts "accord the circuit court 'great deference because its findings of fact largely depend on its evaluation of credibility and demeanor.'" *Goodman v. Angle*, 342 S.W.3d 458, 461 (Mo. App. W.D. 2011) (internal citation omitted).

4

Analysis of a ***Batson*** claim involves a three-part analysis. ***Id.*** That analysis has been outlined as follows:

> once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

***Purkett v. Elem***, 514 U.S. 765, 767 (1995).

To satisfy step one, "the party challenging the strike must object and make a *prima facie* case of racial discrimination by identifying the protected class to which the potential juror belongs." ***Goodman***, 342 S.W.3d at 461. Here, the Taylors objected to the defendants' strike of Howard and noted she was African-American. That procedure satisfied the first step of the analysis.

In the second step of the ***Batson*** analysis, "the proponent of the strike must present a specific and clear race-neutral reason for the strike." ***Id.*** at 462. "Unless a discriminatory intent is inherent in the reason given, the circuit court should deem the reason to be neutral." ***Id.*** Here, the defendants stated they struck Howard because she was a single mother who had difficulties with a blood clot and because she had training as a paralegal. These reasons are race-neutral, so the second step of the analysis is satisfied. Thus, the dispute in this case turns on analysis of the third step: proof of discriminatory intent.

In conducting the third stage of the analysis, it is important to keep in mind that "the ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." ***Purkett***, 514 U.S. at 768. Satisfying this burden requires the opponent of the strike to show "that the

5

proffered reason for the strike was merely pretextual and that the strike was, in fact, motivated by race." ***Goodman***, 342 S.W.3d at 462. Furthermore, "the party challenging the strike 'must present evidence or specific analysis' showing that the proffered reason was pretextual." ***Id.*** (internal citation omitted). "The party 'cannot simply rely on conclusory allegations that the real motivation for the strike was racial in nature.'" ***Id.*** (internal citation omitted). Some common factors courts consider in determining whether a given reason for a strike is pretextual include: "(1) 'the presence of "similarly situated white jurors who were not struck[;]"' (2) 'the degree of logical relevance between the explanation and the case to be tried in terms of the nature of the case and the types of evidence adduced[;]' (3) 'the striking attorney's demeanor or statements during *voir dire*[;]' and (4) the circuit court's past experience with the striking attorney." ***Id.*** (internal citations omitted). Nevertheless, it has been said that the first factor—the presence of similarly situated white jurors who were not struck—is crucial. ***State v. Marlowe***, 89 S.W.3d 464, 469 (Mo. banc 2002). The "chief consideration" is the plausibility of proffered explanations "in view of the totality of the facts and circumstances surrounding the case." ***Brooks***, 960 S.W.2d at 488.

At trial, the Taylors did not identify any similarly situated white jurors. While their attorney said there were single mothers who were not struck and there were others with legal experience who were not struck, he did not identify a venireperson who shared all three characteristics with Howard. Additionally, the defendants' explanation was intimately related to the subject matter of the case. The petition sought damages for the death of a single mother due to

6

complications while being treated for a blood clot.  In view of the fact that there were no similarly situated white jurors and that there was logical relevance in the reason for the strike, the trial court did not clearly err in denying the Taylors' *Batson* challenge.  *See Goodman*, 342 S.W.3d at 463 (holding that a logically relevant similarity between the plaintiff and the venireperson who was struck supported the trial court's decision that the explanation was race-neutral).

The Taylors point to Venireperson Benita Horn ("Horn") as a similarly situated venireperson who was not struck because Horn was also a single mother.[2]  This argument overlooks the full justification for the strike.  Howard was struck for three reasons:  (1) she was a single mother, (2) she had a blood clot, and (3) she had legal training.  Horn gave no responses when voir dire questions were asked about legal training or blood clots.  Given the centrality of the blood clot to the allegations and issues in this case, the fact that Horn did not have experience with a blood clot was significant.  Horn was not similarly situated to Howard.  *See Brooks*, 960 S.W.2d at 488-89 (holding that a potential juror who was not struck was not similarly situated to a potential juror who was struck where the potential juror who was not struck shared only one of three characteristics with the potential juror who was struck).

---

[2] Defendants suggest we should not review this claim of pretext because the Taylors did not identify Horn as a similarly situated juror at trial. *See State v. Collins*, 290 S.W.3d 736, 742 n.4 (Mo. App. E.D. 2009) ("we will decline to review an argument of pretext for the first time on appeal.").  As the claim is without merit in any event, we need not determine whether the statements made by the Taylors' attorney at trial were sufficient to preserve their argument on appeal. *See, e.g.*, *Horner v. FedEx Ground Package System, Inc.*, 258 S.W.3d 532, 544 n.18 (Mo. App. W.D. 2008); *McConnell v. Stallings*, 955 S.W.2d 590, 593 (Mo. App. S.D. 1997).

The defendants articulated a race-neutral reason for their decision to strike Howard, and the Taylors failed to prove that reason was pretextual. Their first point on appeal is denied.

### *Point II: Juror Non-Disclosure*

In their second point, the Taylors claim the trial court erred in denying their request for a new trial based on their allegation that Gurley intentionally failed to disclose the fact that she and her husband had been treated with arterial stents. We disagree.

The question the Taylors claim Gurley should have responded to occurred in the following context. During voir dire, the Taylors' attorney asked, "Are there any of you that have -- or members of your family or somebody you know that has had a deep vein thrombosis?" Several panel members responded, and the attorney followed up by asking how the person had been treated for that condition. When the attorney reached Howard, she referred to the experience she had previously discussed involving a clot in her arm. The Taylors' attorney then clarified "when I refer to a deep vein thrombosis, I'm just talking about a clot, and I'm especially concerned with a clot in the left leg." The next area of inquiry was based on the question, "[a]re there any of you that are familiar with a condition called May-Thurner syndrome?" No one responded. The attorney then followed with this question:

> Are there any of you that have had either -- doesn't sound like you, but someone you know or a close family member where they treated a blood clot in the leg in your vein or they treated it by putting a -- actually doing a -- they call it interventional procedure where the radiologist actually goes inside the vein and puts a catheter in there, and then they infuse medications that are clot-busting medications that you'll hear referred to in this case thrombolytics to break up

8

the clot.  Have any of you had any experience like that or someone you know or member of your family?

The first panel member to respond informed the attorney about a close friend who had a clot in her brain.  Counsel attempted to clarify, asking "They were doing the heart.  Not the vein in the leg?"  The panel member responded, "They went up through the leg, but not the vein in the leg.  I may have been mistaken exactly what you were asking."  Another potential juror stated she had worked for a radiologist some years ago and so had experience with the procedure.  The attorney asked her, "[a]nd back then were they using stents as well?"  The panel member responded in the affirmative.  Then, the attorney stated he had gotten ahead of himself and asked the following question of the entire panel, "Anybody else had any experience where you or a member of your family or close friend has been treated in your veins or your arteries with stents?  Anybody had that experience?"  Several panel members responded and discussed stents in various locations in the body.  Gurley was not among the panel members who responded.  Gurley did, however, respond when Dr. Anbari's attorney asked whether any of the panel members had close family members who had blood clotting problems.  She discussed her husband's heart condition at that time as well.  She said her husband's condition would not affect her decision in the case.  Gurley was ultimately chosen to sit on the jury.

In their post-trial motion, the Taylors' alleged Gurley had intentionally failed to disclose the fact that both she and her husband had been treated with stents in their hearts.  Gurley testified at the hearing on the motion for new trial.  She stated she did not remember the question about stents.  She further stated

she has two stents in her heart that had been put in place in 1995. Her husband who was deceased by the time of trial also had two arterial stents. She thought the voir dire question referred to blood clots. Gurley stated her stent was put in place to treat a heart attack while this case involved a large blood clot so she "just didn't really associate the two that closely." She also said she was not trying to hide the information.

The trial court denied the motion for new trial. With respect to the claim involving Gurley, the trial court found the question was not clear given the "shifting context" and, in any event, the nondisclosure was unintentional as the stents were remote in time. This conclusion was not an abuse of discretion.

"At the cornerstone of our judicial system lies the constitutional right to a fair and impartial jury, composed of twelve qualified jurors." ***Williams By and Through Wilford v. Barnes Hosp.***, 736 S.W.2d 33, 36 (Mo. banc 1987). "To this end 'it is the duty of a juror on voir dire examination to fully, fairly and truthfully answer all questions directed to him (and to the panel generally) so that his qualifications may be determined and challenges may be intelligently exercised.'" ***Id.*** (quoting ***Rickenbaugh v. Chicago, Rock Island & Pacific R.R. Co.***, 446 S.W.2d 623, 626 (Mo. 1969)).

Evaluation of a nondisclosure claim involves two steps. First, the reviewing court must determine whether the question was clear. ***Payne v. Cornhusker Motor Lines, Inc.***, 177 S.W.3d 820, 841 (Mo. App. E.D. 2005). "Whether a question was sufficiently clear is a threshold issue that this Court reviews de novo." ***Johnson v. McCullough***, 306 S.W.3d 551, 555 (Mo. banc 2010). "If the question is not clear, there has been no nondisclosure." ***Payne***,

10

177 S.W.3d at 841. If the question was clear, the court next considers whether the nondisclosure was intentional. ***Saint Louis University v. Geary***, 321 S.W.3d 282, 295 (Mo. banc 2009). If the nondisclosure was intentional, prejudice is presumed; if the nondisclosure was unintentional, the party seeking a new trial must prove prejudice. ***Johnson***, 306 S.W.3d at 557. The determination of whether the nondisclosure was intentional is reviewed for abuse of discretion. ***Id.*** "Only when [the] appellate court is convinced from the totality of the circumstances that the right to [a] fair trial and the integrity of the jury process has been impaired should the trial court be found to have abused [its] discretion." ***Geary***, 321 S.W.3d at 297 (quoting ***Anglim v. Mo. Pac. R.R. Co.***, 832 S.W.2d 298, 306 (Mo. banc 1992)).

The trial court's finding that any nondisclosure that did occur was unintentional was not an abuse of discretion. "Intentional nondisclosure occurs if: 1) there exists no reasonable inability to comprehend the information solicited by the question asked of the prospective juror, and 2) the prospective juror actually remembers the experience or that it was of such significance that his purported forgetfulness is unreasonable." ***Smith v. Brown & Williamson Tobacco Corp.***, 410 S.W.3d 623, 644 (Mo. banc 2013)). "Unintentional nondisclosure exists where, for example, the experience forgotten was insignificant or remote in time, or where the vernireman reasonably misunderstands the question posed[.]" ***Williams***, 736 S.W.3d at 36.

Here, Gurley misunderstood the question. The question was asked during a general discussion of panel members' experience with certain conditions. During the first portion of this discussion, the Taylors' attorney clarified that the

11

questions were meant to elicit only information regarding blood clots in the leg. Under these circumstances, it would be reasonable for a potential juror to understand the question regarding stents as intended to elicit only information regarding stents in the leg. In fact, that is what Gurley believed as she testified at the hearing on the motion for new trial that she thought they were discussing blood clots when the question was asked. Moreover, Gurley testified her stents were placed in 1995 and her husband's stents had been in place for approximately ten years. Thus, her experience with stents was remote in time.

Furthermore, it does not appear from this record that the Taylors' right to a fair trial was impaired. During voir dire, Gurley stated her experience involving her husband's clotting condition and heart problems would not affect her decision in the case. She stated during the hearing on the motion for new trial that she did not think the stents were related to the case because they were not used to treat blood clots.

The trial court did not abuse its discretion in determining the nondisclosure was unintentional and did not prejudice the Taylors. The Taylors' second point is denied.

### Point III: Juror Misconduct

In their third point on appeal, the Taylors assert the trial court erred in denying their request for a new trial based on their claim that Doennig committed juror misconduct when he made several posts on Facebook during the course of the trial. Again, we disagree and affirm the trial court.

In the Taylors' motion for new trial, one of the grounds alleged in support of their claim for relief was that Doennig had committed juror misconduct by

posting on Facebook during the trial.  At the hearing on the motion for new trial,

Doennig testified he served as the jury foreperson in this case.  He remembered

the judge had instructed the jury not to post anything on Facebook about the

case.  The pertinent portion of the actual instruction used at trial stated:  "You are

not permitted to communicate, use a cell phone, record, photograph, video, e-

mail, blog, tweet, text, or post anything *about this trial or your thoughts or*

*opinions about any issue in this case* to any other person or to the Internet,

"facebook", "myspace", "twitter", or any other personal or public web site during

the course of this trial or at any time before the formal acceptance of your verdict

by me at the end of the case."[3] (Emphasis added).  Doennig said he understood

the instruction.  He denied that he looked at his Facebook page during the

proceedings, but he admitted posting items in the evening after court had

recessed.  He did not post any details regarding the trial and asserted his posts

were more like a way of letting people know why they could not get in touch with

him.

The Taylors also introduced into evidence a print out of the posts Doennig

had made during trial.  On October 1, before Instruction No. 1 was given, Doennig

posted "Reporting for jury duty — at Greene County Judicial Facility."  Several

people posted responses including one that asked what kind of case it involved.

Doennig responded he was "Sworn to secrecy as the details of this case.  Most

importantly there is no beverage service and the 3pm cocktail hour is not

observed!"  During the remainder of the trial, Doennig occasionally posted

---

[3] This language was part of Instruction No. 1 which was read to the jury after the jury was selected
and sworn in.

13

information regarding where he ate lunch and dinner.  Some people posted comments about jury duty in general such as "Thank goodness you haven't been sequestered (yet)[.]"  As the trial continued, Doennig posted "[b]egins day 6 of jury duty[,]" "[b]ack in the box for day 7[,]" and "[s]tarting day 8 of jury duty[.]"  No responses were made to these posts.  Ultimately on October 11, after the conclusion of the trial and the jury had been discharged, Doennig posted, "[c]ivic duty fulfilled and justice served.  Now, where's my cocktail????"

The trial court denied the motion for new trial.  With respect to the claim involving Doennig, the trial court found Doennig did not reveal any details about the case and "any appearance of impropriety was not more prejudicial to any party over the other."  This conclusion was not an abuse of discretion.

Review of a trial court's denial of a motion for new trial alleging juror misconduct is for abuse of discretion.  *Travis v. Stone*, 66 S.W.3d 1, 3 (Mo. banc 2002); *State v. Immekus*, 28 S.W.3d 421, 432 (Mo. App. S.D. 2000).  "A trial court will be found to have abused its discretion when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration."  *State v. Moore*, 366 S.W.3d 647, 652 (Mo. App. E.D. 2012).  "If reasonable persons can differ about the propriety of the action taken by the trial court, then it cannot be said that the trial court abused its discretion."  *Id.*

Although the Taylors present this issue as one of juror nondisclosure by stating Doennig intentionally failed to disclose his inability and unwillingness to follow the trial court's instructions, a more apt analogy involves cases of juror misconduct by participating in ex parte communications during trial because the

14

use of social media involves communication. "The purpose of the rule against communications between jurors and third parties is to prevent the jury from receiving information about the case that is not part of the evidence in the record." *Id.* In such cases, the rules applicable to a claim of juror misconduct have been summarized as follows:

> Parties and jurors should avoid all appearance of evil, and if any contact motivated by improper design appears, the jury should ordinarily be discharged or a new trial granted, regardless of the existence of actual prejudice. Accidental and casual contacts with jurors are of rather common occurrence and often unavoidable. If the contact has been wholly innocent, a mistrial should not ordinarily be granted unless it can reasonably be found that there was some improper influence on the jury. . . . Where a juror, by some inquiry or voluntary statement has raised a question as to his impartiality, the question becomes essentially one of fact, and primarily this decision rests with the trial court.

*Miles v. Dennis*, 853 S.W.2d 406, 408 (Mo. App. W.D. 1993) (quoting *Sunset Acres Motel, Inc. v. Jacobs*, 336 S.W.2d 473, 479 (Mo. 1960)). Under this rule, communications that involve extrinsic evidentiary facts or "facts bearing on trial issues but not properly introduced at trial" require a new trial. *McBride v. Farley*, 154 S.W.3d 404, 407 (Mo. App. S.D. 2004) (quoting *Neighbors v. Wolfson*, 926 S.W.2d 35, 37 (Mo. App. E.D. 1996)). For example, in *McBride*, this Court found a trial court had abused its discretion in denying a motion for new trial when it was discovered the jury coordinator had told members of the jury the case had been tried before and the prior trial resulted in a hung jury. *Id.* at 405-06. In contrast, a new trial is not required where the contacts involve unrelated matters, *Chilton v. Gorden*, 952 S.W.2d 773, 780 (Mo. App. S.D. 1997), or brief pleasantries, *Moore*, 366 S.W.3d at 652. Furthermore, the question is essentially a factual one, and the trial court is in the best position to

15

determine the credibility of the witnesses and any prejudicial effect of the alleged misconduct because it hears the evidence regarding the alleged misconduct. *Mathis*, 952 S.W.2d at 365.

In this case, the remarks did not violate the court's instructions not to post on Facebook *about this case.* When questioned about the case during trial, Doennig announced he was sworn to secrecy about the details of the case. Until after the verdict was reached and accepted, Doennig limited his comments to the basic fact that he was serving on a jury. He did not discuss the details of the case and did not even say whether the case was a civil case or a criminal case. Finally, none of the responses provided him with extrinsic evidentiary facts pertinent to the case being tried. The trial court did not abuse its discretion when it denied the Taylors' motion for new trial based on the Facebook posts made by Doennig.

In support of their argument to the contrary, the Taylors rely primarily on *Khoury v. ConAgra Foods, Inc.*, 368 S.W.3d 189 (Mo. App. W.D. 2012), and *Dimas-Martinez v. State*, 385 S.W.3d 238 (Ark. 2011). However, those cases are distinguishable.

*Khoury* is inapposite because it was presented to the appellate court in a different procedural posture. *Khoury* involved a personal injury claim against a company who produced microwave popcorn. 368 S.W.3d at 193. After the jury was empanelled, but before the presentation of evidence began, the attorney for the defendant informed the trial court he had found that one of the jurors "had a Facebook page and was 'a prolific poster for anti-corporation, organic foods.'" *Id.* The attorney moved to strike the juror, and the trial court sustained the motion. *Id.* The Western District found that excusing the juror was not an abuse

16

of discretion.  *Id.* at 201-02.  Here, in contrast, the trial court denied the motion.  Thus, the credibility determination to which this Court must defer is different.

*Dimas-Martinez* is factually distinct.  In that case, the parties discovered the juror's posts to Twitter about the case during the course of trial.  385 S.W.3d at 242.  The judge discussed the issue with the juror, but then the juror continued to tweet during the remainder of the trial.  *Id.* at 247.  That is, after being informed the conduct was impermissible, the juror continued.  *Id.*  Here, in contrast, Doennig was not given the opportunity to correct his behavior during trial, so his comments do not show the same defiance of the trial court's instructions.

We now live in an age of ubiquitous electronic communications.  To say the comments in this case, which simply informed people Doennig was serving jury duty, were improper simply because they were posted on Facebook would be to ignore the reality of society's current relationship with communication technology.  This can be seen by looking at the content of these messages.  If they were communicated to a person face-to-face, they would not be improper.  The comments in this case were more similar to those that would be involved when a person informed his or her supervisor or co-workers they would not be at work because they had jury duty.

The trial court did not abuse its discretion.  The Taylors' third point is denied.

## Conclusion

The trial court's judgment is affirmed.

MARY W. SHEFFIELD, J. - OPINION AUTHOR

JEFFREY W. BATES, P.J., - CONCURS

GARY W. LYNCH, J. - CONCURS