**Michele L. MURPHY, Appellant,**

v.

**Michael B. ROTH, Appellee.**

No. 4D14–4830.

District Court of Appeal of Florida, Fourth District.

Oct. 5, 2016.

44

Spencer T. Kuvin of the Law Offices of Craig Goldenfarb, P.A., West Palm Beach, and Andrew A. Harris of Burlington & Rockenbach, P.A., West Palm Beach, for appellant.

Carri S. Leininger of Williams, Leininger & Cosby, P.A., North Palm Beach, for appellee.

LINDSEY, NORMA S., Associate Judge.

Michele L. Murphy (hereinafter "Plaintiff") appeals from a final judgment and seeks review of an order denying her motion for a new trial. Plaintiff contends that a juror engaged in misconduct by posting comments about the case on social media and by failing to disclose certain information during *voir dire*. The sole issue on appeal is whether the trial court abused its discretion in denying Plaintiff's motion for a new trial based on this alleged misconduct. For the reasons set forth below, we find that it did not and affirm.

This case involved an automobile accident. Plaintiff brought suit against Michael B. Roth ("Defendant"), claiming that she sustained injuries due to Defendant's negligent operation of his vehicle. Issues of liability and damages were hotly contested. At the trial below, Plaintiff claimed that she was hit from behind by a phantom car, causing her to swerve and lose control, and that she was then hit in the front by Defendant's car and forced off the road. Defendant claimed that Plaintiff struck his car on the rear passenger side, skewing his car to the right, and then hit the front right side of his car, sending him spinning off the road.

At the beginning of *voir dire*, the trial court instructed the jurors not to communicate with anyone about the case or their jury service:

You must not communicate with anyone, including friends and family members, about this case, the people and places involved, or your jury service. You must not disclose your thoughts about this case or ask for advice on how to decide this case.

I want to stress that this rule means you must not use electronic devices or computers to communicate about this case, including tweeting, texting, blogging, emails, posting information on a website or chatroom, or any other means at all. Do not send or accept any messages to and from anyone about this case or your jury service.

Also, during *voir dire*, the trial court inquired whether anyone had been involved in a similar situation:

This is a case about injuries received in an automobile accident. Ms. Murphy claims that Mr. Roth caused an automobile accident that resulted in certain injuries. Mr. Roth denies those claims. Instead, Mr. Roth claims Ms. Murphy caused the accident and that the injuries from the accident are not as extensive as Ms. Murphy claims.

\* \* \*

All right. You have heard me give you a brief description of what this case is about. And, again, that's all you're going to be allowed to hear until a jury is picked. Is there anyone here personally or has had a close relative or a very

close friend involved in a situation that sounds similar in any way to this case, whether or not it resulted in a lawsuit or not?"

In response, several prospective jurors discussed accidents involving themselves or their family members, all of which involved either a lawsuit or an injury. The trial court then asked: "All right. Anyone else?" The juror at issue herein ("Juror 5") did not respond.

Later during *voir dire*, Plaintiff's counsel asked if anyone had a family member or friend who had undergone a cervical fusion. Juror 5 responded that his stepmother was in a car accident and had some plates inserted in her neck, but was not sure if the procedure was a cervical fusion. Plaintiff's counsel asked him a few follow-up questions about his step-mother's recovery after surgery, but did not inquire further about the accident or whether a lawsuit arose.

At another point during *voir dire*, Plaintiff's counsel asked the jurors about their feelings towards personal injury lawsuits. In addition to believing that there were probably more frivolous lawsuits than there should be, Juror 5 stated the following:

I'm kind of like indifferent about it. Like, I really don't—it's necessary. Some people, sure they need it. But I feel like some people also do it just for the money, like he said up front.

\* \* \*

I wouldn't say 80%. I can't put a number on it. But I feel like, sure, a good amount of people sue for dumb reasons.

After the jury was selected and sworn, the trial court again gave an instruction to the jury to not communicate about the case:

In this age of electronic communication I want to stress again that just as you must not talk about this case face-to-face, you must not talk about this case by using an electronic device. Do not send or accept any messages related to this case or your jury service. Do not discuss this case or ask for advice by any means at all, including posting information on an Internet website, chatroom, or blog.

The trial took place between May 12 and May 16, 2014. The jury returned a $39,000 verdict for past and future medical expenses and apportioned liability, 60% to Plaintiff and 40% to Defendant. Since the jury did not find that Plaintiff had suffered a permanent injury, no damages for pain and suffering were awarded.

Plaintiff filed a motion for juror interview based on newly discovered evidence, wherein she contended that her right to a fair and impartial jury was compromised by Juror 5. Plaintiff also filed a motion for new trial incorporating, by reference, her motion for juror interview. In support of these motions, Plaintiff alleged that Juror 5 posted a series of tweets on his Twitter[1] account during the days of jury selection and trial, which included the following:

a. I got picked as a juror ... I hate this s—— I'm so pissed, I even half assed all my answers and I dressed terrible.

b. Being a juror isn't bad, people I'm working with are pretty cool. But I still hate the fact that I have to be here all day.

1. "Twitter is a real-time information network that lets people share and discuss what is happening at a particular moment in time through the use of 'tweets,' updates composed of 140 characters or less. The service allows users either to Direct Message (DM) specific individuals or to use 'twitter posts' accessible to the public. The process of posting messages on Twitter is commonly referred to as 'tweeting.'" *Dimas–Martinez v. State*, 2011 Ark. 515, 385 S.W.3d 238, 243 n. 3 (2011) (citation omitted).

c. Everyone is so money hungry that they'll do anything for it.

After conducting two hearings, the trial court granted the motion for juror interview. During the interview, Juror 5 admitted that the Twitter account in question, although titled under a pseudonym, was his and that he posted all of the tweets at issue. The trial court asked Juror 5 about his understanding of the court's instruction to not communicate about the case or his jury service on social media. Juror 5 responded that he thought the instruction "pretty much" meant "don't talk about the case." Juror 5 testified that he did not tweet while sitting in the courtroom during the trial and that he did not intentionally or deliberately disobey the court's order regarding the use of social media. Finally, Juror 5 denied telling anyone else his views about the case at any time prior to the commencement of deliberations.

The trial court specifically asked Juror 5 about his tweet that he "half assed" his answers. Juror 5 replied that he was "kind of confused" by what Plaintiff's counsel was saying during jury selection. Juror 5 elaborated: "Because, like, I got nervous so when he was asking me questions I didn't really know what to say so all my questions were all mumble jumbled and then that's pretty much what I meant by it." And finally, the trial court asked Juror 5 whether he was referring to the trial when he tweeted, "Everyone is so money hungry that they will do anything for it"? Juror 5 responded:

> No, ma'am, I was not. I was actually tweeting about the fact that we got into an accident, me and my father, May 2, and then my dad got the court order during the trial case, and that's when I woke up after my nap he told me about it.

After conducting what would be the fourth post-trial hearing on this case, the trial court denied Plaintiff's motion and declined to take any action against Juror 5. Thereafter, the trial court entered a final judgment in favor of Plaintiff for $27,535.17 from which this appeal was taken.

 A trial court's order on a motion for new trial is reviewed for an abuse of discretion. *Duong v. Ziadie,* 125 So.3d 225, 227 (Fla. 4th DCA 2013). "If reasonable people could differ as to the propriety of the court's ruling, then the abuse of discretion standard has not been met." *Taylor v. Magana,* 911 So.2d 1263, 1267 (Fla. 4th DCA 2005) (quoting *Vanderbilt Inn on the Gulf v. Pfenninger,* 834 So.2d 202, 203 (Fla. 2d DCA 2002)). As the Florida Supreme Court explained in *Canakaris v. Canakaris,* "[i]n reviewing a true discretionary act, the appellate court must fully recognize the superior vantage point of the trial judge and should apply the 'reasonableness' test to determine whether the trial judge abused his discretion." 382 So.2d 1197, 1203 (Fla.1980). A discretionary ruling of a trial judge should be disturbed only when the decision fails to satisfy this test of reasonableness. *Id.*

Plaintiff argues that the comments posted within Juror 5's tweets showed not only a disdain for the court system and his jury service but also a clear bias against Plaintiff which, when coupled with his failure to disclose a recent accident involving him and his father, deprived Plaintiff of the right to a fair and impartial jury. Accordingly, Plaintiff contends that the trial court abused its discretion in denying her motion for a new trial. Defendant argues that Juror 5's tweets do not amount to prejudicial misconduct and that Plaintiff cannot, on this record, establish that she is entitled to a new trial based on the nondisclosure of the recent accident.

"When the embrace of social media is ubiquitous, it cannot be surprising that examples of jurors using platforms like Facebook and Twitter 'are legion.'" *United States v. Feng Ling Liu*, 69 F.Supp.3d 374, 386 (S.D.N.Y.2014) (citation omitted). "Prejudice can come through a whisper or a byte." *Dietz v. Bouldin*, ⸻ U.S. ⸻, ⸻, 136 S.Ct. 1885, 1895, 195 L.Ed.2d 161 (2016).

Although no Florida court has directly addressed the issue of juror misconduct arising from the use of social media during a trial, in *United States v. Fumo*, 655 F.3d 288 (3d Cir.2011), the Third Circuit held that the trial court did not abuse its discretion in denying the defendant's motion for a new trial on the basis of a juror's comments about the trial on Facebook and Twitter. The trial court questioned the juror and determined that, although in violation of the court's instruction not to discuss the case outside the jury room, the comments were "nothing more than harmless ramblings having no prejudicial effect." *Id.* at 298–99. The trial court found that the comments "raised no specific facts dealing with the trial," and that nothing in the comments "indicated any disposition toward anyone involved in the suit." *Id.* at 306.

The Third Circuit explained that "while prohibiting and admonishing jurors from commenting—even obliquely—about a trial on social networking websites and other internet mediums is the preferred and highly recommended practice, it does not follow that every failure of a juror to abide by that prohibition will result in a new trial." *Id.* at 305. Rather, courts should determine if the complaining party was "substantially prejudiced." *Id.* In light of the trial court's findings, which were based in large part on the juror's testimony and demeanor, the Third Circuit reasoned that there was "no plausible theory" for how

the defendant "suffered any prejudice, let alone substantial prejudice," from the juror's Facebook and Twitter comments. *Id.* at 306.

Similarly, the Missouri Court of Appeals held that a trial court did not abuse its discretion in denying a motion for a new trial based on a juror's Facebook posts in which he mentioned that he was on jury duty, noted that he was "sworn to secrecy" as to the details of the case, and joked that "there is no beverage service and the 3pm cocktail hour is not observed!" *J.T. ex rel. Taylor v. Anbari*, 442 S.W.3d 49, 57–60 (Mo.Ct.App.2014). The Missouri court reasoned that the trial court did not abuse its discretion in finding that the juror "did not reveal any details about the case and any appearance of impropriety was not more prejudicial to any party over the other." *Id.* at 58 (internal quotation marks omitted). The court explained that the question of whether a new trial is required "is essentially a factual one, and that the trial court is in the best position to determine the credibility of the witnesses and any prejudicial effect of the alleged misconduct because it hears the evidence regarding the alleged misconduct." *Id.* at 59. The court further emphasized that the juror's remarks did not violate the trial court's "instructions not to post on Facebook *about this case.*" *Id.* (emphasis in original). The court noted that: "To say the comments in this case, which simply informed people [the juror] was serving jury duty, were improper simply because they were posted on Facebook would be to ignore the reality of society's current relationship with communication technology." *Id.* at 59–60.

In addition, the Second Circuit held that a defendant's Sixth Amendment right to an impartial jury was not violated by a juror who "friended" a fellow juror and posted comments on Facebook such as

"Jury duty 2morrow. I may get 2 hang someone ... can't wait," and "Jury duty sucks!" *See United States v. Ganias*, 755 F.3d 125, 130–33 (2d Cir.2014), *reh'g en banc granted on other grounds by* 791 F.3d 290 (2d Cir.2015). In *Ganias*, the trial court questioned the juror and credited his testimony that he deliberated impartially and in good faith. The Second Circuit found that the trial court's credibility determination was not clearly erroneous and that it did not abuse its discretion in denying the motion for a new trial. *Id.* at 132. Likewise, in *United States v. Feng Li*, 630 Fed.Appx. 29, 32–33 (2d Cir.2015), the Second Circuit affirmed the denial of a defendant's motion for a new trial on the grounds that a tweeting juror violated his Sixth Amendment right to a fair and impartial jury where the trial court interviewed the juror and found, based on her responses and explanations, that she was neither dishonest nor biased.

In the instant case, Plaintiff relies on *Dimas–Martinez v. State*, 2011 Ark. 515, 385 S.W.3d 238 (2011). In that case, the Arkansas Supreme Court held that a defendant in a death penalty case was denied a fair trial where a juror disregarded the trial court's instructions and tweeted about the case, even after the trial court questioned the juror about his tweets and admonished him to stop tweeting and to otherwise refrain from discussing the case any further. During the proceedings, the juror tweeted: "Choices to be made. Hearts to be broken. We each define the great line." *Id.* at 246. When the trial court questioned the juror about the tweet, the juror admitted posting on Twitter during the trial and explained that the tweet in question did not pertain only to the case, but also to "future stuff." *Id.* The trial court refused to strike the juror. *Id.* The Arkansas Supreme Court found troubling the fact that "even after the juror was questioned, admitted to the miscon-

duct, and was again admonished not to discuss the case, he continued to tweet, specifically during sentencing deliberations." *Id.* at 247.

*Dimas–Martinez* is distinguishable in that it involved a situation where a juror continued to post comments on social media even after the trial court became aware, mid-trial, of the juror's postings and expressly instructed him to stop. Thus, the juror was unquestionably either unwilling to follow the court's instructions or simply incapable of doing so. Here, Juror 5's tweets were discovered after the verdict had been rendered and were the subject of four separate hearings conducted by the trial court, including one in which the trial court questioned Juror 5 in detail about these tweets.

■ In denying Plaintiff's motion for a new trial and taking no action against Juror 5, the trial court necessarily credited and accepted Juror 5's explanation that this misconduct was neither intentional nor willful, and that none of his tweets related specifically to this case. Although its order contained no written findings, the trial court likewise necessarily found that the comments contained in Juror 5's tweets were insufficiently prejudicial to Plaintiff to require a new trial. There is no evidence that any of the other jurors saw, or had any discussions about, Juror 5's tweets. Moreover, nothing in the plain language of Juror 5's tweets discusses any facts specific to this case or the parties involved. Thus, it cannot be said that the trial court abused its discretion in concluding that Juror 5 misinterpreted the scope of the trial court's instruction not to post about his jury service and that he did not intentionally violate the court's order. While Juror 5's tweets are potentially offensive on a number of levels, the trial court acted within its discretion to inter-

view Juror 5, assess his credibility and, in doing so, deny Plaintiff's motion for a new trial based thereon.

With regard to whether Juror 5's tweet that "[e]veryone is so money hungry that they'll do anything for it" demonstrates that he was biased against Plaintiff, the trial court clearly credited Juror 5's testimony that the "money hungry" post was not about Plaintiff or the trial in this case. More importantly, during *voir dire,* Juror 5 expressed similar opinions that some people sue "just for the money" or for "dumb reasons," and that there were probably more frivolous lawsuits than there should be.[2] Thus, Juror 5's mid-trial tweet that "everyone is so money hungry" is consistent with the views he had expressed in *voir dire*—hence, no argument can be made that there was any prejudice to Plaintiff based on this tweet.

■ In addition to the arguments with respect to Juror 5's tweeting, Plaintiff contends that she is entitled to a new trial because Juror 5 lied during *voir dire* by failing to disclose a recent accident involving him and his father. Defendant contends that Plaintiff is not entitled to a new trial because Plaintiff cannot establish that Juror 5's nondisclosure was material, that Juror 5 concealed this information, or that Plaintiff's counsel acted diligently to discover this information during *voir dire.*

■■ For a juror's nondisclosure of information during *voir dire* to warrant a new trial, the complaining party must establish that: (1) the information is relevant and material to jury service in the case; (2) the juror concealed the information during questioning; and (3) the failure to disclose the information was not attributable to the complaining party's lack of diligence. *De La Rosa v. Zequeira,* 659

So.2d 239, 241 (Fla.1995). Under *De La Rosa,* the burden is on the moving party to prove entitlement to a new trial on the basis of juror nondisclosure. *Beyel Bros., Inc. v. Lemenze,* 720 So.2d 556, 557 (Fla. 4th DCA 1998).

■ Under the first prong of *De La Rosa,* "the complaining party must establish not only that the nondisclosed matter was 'relevant'—as all prior litigation history is—but also that it is 'material to jury service in the case.'" *Roberts v. Tejada,* 814 So.2d 334, 339 (Fla.2002). There is no "bright line" test for determining materiality, and thus "materiality must be based on the facts and circumstances of each case." *Garnett v. McClellan,* 767 So.2d 1229, 1230 (Fla. 5th DCA 2000) (citing *Leavitt v. Krogen,* 752 So.2d 730 (Fla. 3d DCA 2000)). "Omitted information has been considered relevant and material where it implies a bias or sympathy for the other side which in all likelihood would have resulted in the use of a peremptory challenge." *McCauslin v. O'Conner,* 985 So.2d 558, 561 (Fla. 5th DCA 2008).

Here, the record is insufficient to establish that Juror 5's nondisclosure of the accident with his father was material. If Juror 5 was involved in an automobile accident that occurred a week before trial, and the accident involved injuries and/or involved someone making a claim or filing a lawsuit, such information would clearly be material in the context of a personal injury case arising out of an automobile accident. However, the only information on the record is that Juror 5 and his father "got into an accident" on May 2, 2014, and that his father "got the court order" during the trial of Plaintiff's case, which coincided with Juror 5's tweet that "[e]veryone is so money hungry that they will do any-

---

**2.** In addition to Juror 5, at least two other jurors, who Plaintiff did not seek to have stricken from the panel, had expressed similar views during *voir dire.*

thing for it." It is unclear, however, whether the accident involved an automobile, a golf cart, a boat, or something else, whether there were any injuries, minor or serious, who was at fault, what were the damages, and what was the substance of the court order Juror 5's father received.

At the hearing on the motion for a new trial, the trial court acknowledged the "possibility that [Juror 5] made that comment because the accident was so minor, you know, maybe just a tap or something like that, that he was shocked when his father got notice of a lawsuit[.]" The trial court further queried whether Juror 5 could have interpreted her question to say "has anybody been involved in an accident involving injuries? And that he didn't feel that the accident that he and his father were in was similar to this case, because this case involved injuries." This Court cannot presume that the facts and circumstances of the May 2 accident are analogous to the facts and circumstances of the instant case when no support for such a conclusion exists on the record. Because the trial court questioned Juror 5 extensively, the trial court was in the best position to determine both the credibility of Juror 5 and any prejudice to Plaintiff as a result thereof.

In addition, during the juror interview, Plaintiff did not seek to ask any questions of Juror 5 about this accident or about why he did not disclose it in *voir dire*. Instead, after the trial court had asked all of its questions of Juror 5, Plaintiff asked the court, and it agreed, to pose two or more additional follow-up questions unrelated to the accident. In any event, Plaintiff's counsel conceded at the hearing on the motion for a new trial that he was not seeking reexamination of Juror 5 on the nondisclosure issue. Thus, without more information about the facts of the undisclosed accident, Plaintiff cannot meet her burden to establish the materiality prong of *De La Rosa*.

Under the second prong of *De La Rosa*, "information is considered concealed for purposes of the three part test where the information is 'squarely asked for' and not provided." *Birch ex rel. Birch v. Albert*, 761 So.2d 355, 358 (Fla. 3d DCA 2000). "Finally, the third prong addresses whether the cause of the failure to elicit the information was due to the fault of the complaining party." *Pembroke Lakes Mall Ltd. v. McGruder*, 137 So.3d 418, 429 (Fla. 4th DCA 2014). Because there is insufficient record evidence to establish the first prong of *De La Rosa*, we decline to address the second and third.

For the foregoing reasons, we affirm the final judgment and the order denying Plaintiff's motion for new trial.

*Affirmed.*

GROSS and LEVINE, JJ., concur.