IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs October 29, 2014

## STATE OF TENNESSEE v. WILLIAM DARELLE SMITH

**Appeal from the Criminal Court for Davidson County**
**No. 2007-C-2675    Seth W. Norman, Judge**

_____

**No. M2014-00059-CCA-R3-CD - Filed January 7, 2015**

_____

A jury convicted the defendant, William Darelle Smith, of first degree (premeditated) murder, and he was sentenced to life in prison. On appeal, this court affirmed the denial of the motion for a new trial. The defendant appealed a single issue to the Tennessee Supreme Court: that his right to an impartial jury was compromised because the trial court did not hold a hearing after the discovery, during jury deliberations, that a juror was not only acquainted with one of the State's witnesses but had sent the witness a communication through Facebook complimenting her on her testimony. The Tennessee Supreme Court concluded that the trial court had erred in refusing to hold a hearing and remanded the case. After a hearing during which the juror and the witness testified regarding the nature of both their relationship and the communication, the trial court again denied the defendant a new trial. The defendant appeals. We conclude that the State sufficiently rebutted any presumption of prejudice raised by the juror's extrajudicial communication or by his concealment of his acquaintance with the witness, and accordingly we affirm the judgment of the trial court.


**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which ROGER A. PAGE, and ROBERT H. MONTGOMERY, JR., JJ., joined.

Dawn Deaner, District Public Defender; and Joan Lawson and Michael Engle (at hearing), and Jeffrey A. DeVasher and Emma Rae Tennent (on appeal), Assistant District Public Defenders, for the appellant, William Darelle Smith.

Robert E. Cooper, Jr., Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Victor S. Johnson, III, District Attorney General; and Katrin Miller, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTUAL AND PROCEDURAL HISTORY**

On June 4, 2007, a passing motorist discovered the body of the defendant's wife,[1] Zurisaday Villanueva, lying by the side of the road; she had been shot twice. *State v. Smith*, 418 S.W.3d 38, 42 (Tenn. 2013). At trial, the State introduced testimony and DNA evidence implicating the defendant.

The defendant's father testified that he had loaned his car to the defendant and that the defendant was driving it in June 2007. On the day after the discovery of the victim's body, the defendant and his father drove the car to Chicago and left it with a family member. *State v. William Darelle Smith*, No. M2010-01384-CCA-R3-CD, 2012 WL 8502564, at *2 (Tenn. Crim. App. Mar. 2, 2012). The car was impounded by Chicago police, and the victim's DNA was recovered from blood spots found on the passenger door control panel and the passenger headrest. *Id.* at *4-5. When the defendant's father discovered that the victim had been shot he "tried to get [the defendant] to turn himself in." *Id.* at *2.

The defendant's cousin, Nakeda Kirby, testified that the defendant told her about the homicide. *Id.* The defendant told Ms. Kirby that he and the victim were fighting, that the victim brandished a gun, and that the gun went off during a struggle. *Id.* He told her that he tried to move the victim, but she grabbed his hand and the gun went off again. *Id.* At the time he told Ms. Kirby about the homicide, it was not publicly known that the victim had been shot twice. *Id.*

Julia Crawford, the defendant's girlfriend, testified that she had been out with the defendant on the Friday before the crime. *Id.* at *3. As they were leaving the defendant's apartment, the defendant saw the victim, told Ms. Crawford that the victim was armed, and then laid a gun in Ms. Crawford's lap, telling her to kill the victim. *Id.* She believed he was serious. *Id.* After the defendant drove Ms. Crawford home and pulled into her driveway, he held a gun to Ms. Crawford's head, instructed her not to cry, and asked, "Are you gonna be

---

[1] Witnesses at trial testified both that the victim was the defendant's wife and that the victim was the defendant's girlfriend. *State v. William Darelle Smith*, No. M2010-01384-CCA-R3-CD, 2012 WL 8502564, at *2 n.1 (Tenn. Crim. App. Mar. 2, 2012).

with me, you gonna stand by my side[?]" Ms. Crawford was scared and said she would. *Id.* On a Sunday night after the homicide, the defendant confessed to Ms. Crawford that he had killed the victim. *Id.*

As part of the State's case, the prosecution presented the testimony of Dr. Adele Lewis:

> Dr. Lewis, the assistant medical examiner who performed [the victim's] autopsy, testified that [the victim] had been shot twice, once in the chest and once in the back of the head. While Dr. Lewis could not ascertain which shot had been fired first, she stated that [the victim] could have survived the chest wound with proper medical attention but that she would not have survived the head wound. She also testified that the shots had been fired from an "indeterminate range" and that she found no evidence that the muzzle of the pistol had been held against [the victim's] skin. Dr. Lewis concluded that [the victim's] death was a homicide.

*Smith*, 418 S.W.3d at 43.

During voir dire, the jurors were never asked if they were acquainted with Dr. Lewis, despite the fact that three of the jurors were employed at Vanderbilt University Medical Center, where Dr. Lewis had completed a residency. *Id.* at 42. The trial court instructed the jury at the beginning of trial that it would be "highly improper" to do anything such as "taking [a] cell phone and texting and trying to find out about a trial or things like that," admonishing the jury that it must decide solely on the evidence presented in the courtroom. *Id.* In its preliminary instructions, the trial court also warned the jury:

> During the course of the trial, you should not talk with any witnesses, defendants, or attorneys involved in this case. Please do not talk with them about any subject whatsoever. You may see them in the hallway, on an elevator, or at some other location. If you do, perhaps the best standing rule is not to say anything.

*Id.* This admonition was not repeated, although the trial court instructed the jury before they were dismissed for the day that the jurors were to remember its prior instructions. *Id.* n.2.

The next day, the trial court charged the jury, and it began deliberating. About one

hour into deliberations, the trial judge received an email from Dr. Lewis disclosing an interaction she had with one of the jurors on Facebook after she had given her testimony. The email stated:

> Judge Norman,
>
> I can't send you actual copies of the emails since Facebook is blocked from my computer here at work, but here is a transcript:
>
> Scott Mitchell: "A-dele!! I thought you did a great job today on the witness stand...I was in the jury...not sure if you recognized me or not!! You really explained things so great!!"
>
> Adele Maurer Lewis: "I was thinking that was you. There is a risk of a mistrial if that gets out."
>
> Scott Mitchell: "I know...I didn't say anything about you...there are 3 of us on the jury from Vandy and one is a physician (cardiologist) so you may know him as well. It has been an interesting case to say the least."
>
> I regret responding to his email at all, but regardless I felt that this was a fairly serious violation of his responsibilities as a juror and that I needed to make you and [G]eneral Miller aware. I did not recognize the above-referenced cardiologist or any other jurors.
>
> Adele Lewis, MD

After the guilty verdict, defense counsel asked the court to conduct a hearing on the interaction above. The trial court stated that it was "satisfied" with the communication from Dr. Lewis and did not believe further inquiry was necessary. *Id.* at 44. The Tennessee Supreme Court concluded that the trial court should have held a hearing to determine whether there was cause to disqualify the juror. *Id.* at 48. The Court noted that the email provided reliable and admissible evidence that extra-judicial communication occurred. *Id.* Accordingly, the defendant was entitled to a rebuttable presumption of prejudice and the State was required to demonstrate that the communication was harmless. *Id.* Reviewing the decision not to conduct a hearing *de novo*, the Tennessee Supreme Court concluded that the trial court erred. *Id.* The Court instructed the trial court to inquire into "'(1) the subject matter of the contact, (2) to whom it was directed, (3) the medium of the exchange, (4)

-4-

whether any responses were received, and (5) the content of the communications.'" *Id.* at 49 (quoting J. Paul Zimmerman, *A Practical Guide to the Development of Jury Charges Regarding Social Media*, 36 Am. J. Trial Advoc. 641, 642 (2013)).

On remand, the trial court conducted the hearing, and Dr. Lewis and Juror Glenn Mitchell testified. Dr. Lewis stated that she and Mr. Mitchell became acquainted because he was an administrative assistant at Vanderbilt in the Department of Pathology while she was a resident there. They worked in the same department for the three-year period ending in 2005. Dr. Lewis described their relationship as "[n]ot close at all" and stated they were "just acquaintances." They did not work in the same building because she rotated all over campus, so she only saw him once every couple of months. They did not have any social contact, but at some point became Facebook "friends." Dr. Lewis could not recall who extended the friendship request. Dr. Lewis testified that she did not remember ever receiving emails or direct Facebook communications from Mr. Mitchell prior to the trial.

While testifying at trial, Dr. Lewis recognized Mr. Mitchell as "someone who I thought looked vaguely familiar, but if you had asked me who he was I would not have known." She received the Facebook message that evening. Dr. Lewis clarified that it was a private message which would not have been visible to anyone else. Dr. Lewis was "alarmed" at receiving the message. Dr. Lewis testified that in her response ("I was thinking that was you. There is a risk of a mistrial if that gets out"), she intended to convey that "this is inappropriate behavior for you, and there may be a mistrial if someone finds out that you are communicating with me." After attempting to alert him that the message he had sent could be a problem, Dr. Lewis decided to contact the trial judge and the District Attorney General. Because her workplace did not permit her to access Facebook, she took out her phone and transcribed the messages from the phone into the email she sent to the trial court. She had had no direct contact with Mr. Mitchell since the trial.

Mr. Mitchell's testimony regarding his relationship with Dr. Lewis was substantially the same as Dr. Lewis's. Mr. Mitchell testified that at the time they became acquainted, he was an administrative assistant to the chair of the pathology department while Dr. Lewis was a resident and that he and Dr. Lewis worked in the same department for two to three years. They saw each other "[r]andomly in the hallways, or she would stop by the office and ask for something" and they met "not often." Although he had contact with the residents once a week, this contact was generally through a beeper or the telephone. Mr. Mitchell also characterized the relationship as "acquaintances" and testified that he did not see Dr. Lewis socially. The only personal contact between the two that Mr. Mitchell recalled was a link that Dr. Lewis sent him toward the end of her residency allowing him to view pictures of her children on social media. He did not recall who sent the Facebook "friend" request.

Mr. Mitchell testified that he recognized Dr. Lewis at trial and that he sent the Facebook message to Dr. Lewis from his home prior to the beginning of deliberations. Mr. Mitchell did not tell anyone else on the jury about the contact with Dr. Lewis or that he knew Dr. Lewis. The other Vanderbilt employees he referenced in the message had not indicated that they knew her, and he was not acquainted with them prior to serving on the jury with them.[2]

The trial court, after considering the testimony at the hearing, denied the defendant a new trial based on the communication. The trial court considered the factors laid out by *State v. Adams*, 405 S.W.3d 641, 654 (Tenn. 2013), and it found that the potential influence of the message was insignificant, that Mr. Mitchell and Dr. Lewis were merely acquaintances, that they had not had meaningful contact for five years before the 2010 trial, that no evidence adduced at trial was discussed in the Facebook exchange, and that while the contact was completely improper, "it was ultimately merely a greeting initiated by an old acquaintance which most assuredly would have had no effect on the outcome of the jury verdict." The trial court further found that Mr. Mitchell was the only juror affected; that the communication was a private message which occurred immediately before deliberations; and that the "quantity and quality of the evidence in the State's possession was particularly great," including the blood evidence, the defendant's confessions, the statements the defendant made to his girlfriend, and his knowledge of the number of shots fired.

## ANALYSIS

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a right to trial by an impartial jury. U.S. Const. amend. VI; Tenn. Const. art. I, § 9; *Smith v. State*, 357 S.W.3d 322, 347 (Tenn. 2011). "'The impartial jury guaranteed by constitutional provisions is one which is of impartial frame of mind at the beginning of trial, is influenced only by legal and competent evidence produced during trial, and bases its verdict upon evidence connecting defendant with the commission of the crime charged.'" *State v. Hugueley*, 185 S.W.3d 356, 377-78 (Tenn. 2006) (quoting *State v. Lawson*, 794 S.W.2d 363, 367 (Tenn. Crim. App. 1990)). Jurors may weigh the evidence in

---

[2]We agree with the parties that Mr. Mitchell's testimony regarding whether the verdict would have been the same if another pathologist had testified is barred by Tennessee Rule of Evidence 606(b), which prohibits testimony regarding "any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon any juror's mind or emotions as influencing that juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes," and allows only testimony regarding any extraneous prejudicial information brought to the jury's attention, any outside influence brought improperly to bear on a juror, or any agreement to be bound by a gambling verdict.

light of their own knowledge and experience, but their verdict must nevertheless be based on the evidence introduced at trial. *Patton v. Rose*, 892 S.W.2d 410, 413 (Tenn. Ct. App. 1994). Jurors must remain, both in fact and in public perception, disinterested and impartial. *State v. Smith*, 418 S.W.3d 38, 42 (Tenn. 2013). In the case at bar, we identify two potential bases for a claim that the defendant's right to trial by an impartial jury was violated: that a juror was exposed to extraneous prejudicial information through contact with a witness for the State or, alternatively, that the same juror harbored personal bias due to a friendship with a witness for the State.

When a jury verdict is based on something other than the evidence introduced at trial, such extraneous prejudicial information may warrant a new trial. *Patton v. Rose*, 892 S.W.2d at 413-14. Extraneous information is information from a source outside the jury, and can include communications with non-jurors about the case. *Carruthers v. State*, 145 S.W.3d 85, 92 (Tenn. Crim. App. 2003). A prejudicial influence may be a fact or opinion. *Id.* When a juror engages in an unexplained conversation with a third party, it may be cause for a new trial. *State v. Blackwell*, 664 S.W.2d 686, 689 (Tenn. 1984). Generally, an exposure to extraneous prejudicial information raises a presumption of prejudice; unless the State is able to rebut the presumption by explaining the conduct or demonstrating its harmlessness, the verdict cannot stand. *Walsh v. State*, 166 S.W.3d 641, 647 (Tenn. 2005). The State may demonstrate harmlessness by showing that "'it appears beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained.'" *Smith*, 418 S.W.3d at 46 (quoting *State v. Brown*, 311 S.W.3d 422, 434 (Tenn. 2010)). However, when a jury is not sequestered, a presumption of prejudice is not raised solely by virtue of extra-judicial communication between a juror and a third party; to raise the presumption of prejudice, the defendant must also show that "some extraneous prejudicial fact or opinion 'was imported to one or more jurors or some outside improper influence was brought to bear on one or more jurors.'" *Smith*, 418 S.W.3d at 46 (quoting *Blackwell*, 664 S.W.2d at 689). In remanding this case to the trial court, the Tennessee Supreme Court concluded that the email which Dr. Lewis had sent the trial court was "sufficient to trigger the rebuttable presumption of prejudice" and that the State was required to explain the conduct or demonstrate its harmlessness.[3] *Smith*, 418 S.W.3d at 48.

---

[3]As noted, the remanding Court observed that the burden does not shift to the State to demonstrate harmlessness unless there is, in addition to a showing of extra-judicial communication, evidence that some extraneous prejudicial fact or opinion or improper influence was put before the jury. *Smith*, 418 S.W.3d at 46. The Court's conclusion that the presumption was triggered is the law of the case. *State v. Carter*, 114 S.W.3d 895, 902 (Tenn. 2003) ("[W]hen an initial appeal results in a remand to the trial court, the decision of the appellate court establishes the law of the case, which must be followed upon remand by the trial court and by an appellate court on a second appeal.").

In evaluating the impact of extraneous evidence, the court should consider:

> (1) the nature and content of the information or influence, including whether the content was cumulative of other evidence adduced at trial; (2) the number of jurors exposed to the information or influence; (3) the manner and timing of the exposure to the juror(s); and (4) the weight of the evidence adduced at trial.

*State v. Adams*, 405 S.W.3d 641, 654 (Tenn. 2013). The court must use the factors to determine "whether there exists a reasonable possibility that the extraneous prejudicial information or improper outside influence altered the verdict." *Id.*

In this case, both witnesses testified regarding the substance of the extra-judicial communication. Dr. Lewis testified that the email which she had sent to the trial court was a transcription of the messages exchanged and that she had the messages displayed on her phone so that she could accurately copy them. Mr. Mitchell agreed that the email accurately represented the substance of the communication. As directed, the trial court inquired into the subject of the communication, to whom it was directed, the medium, responses, and the content, and it found that exchange was limited to the messages between Mr. Mitchell and Dr. Lewis and that the substance of the private message was "merely a greeting." The evidence does not preponderate against this finding. *See State v. Sammy D. Childers*, No. W2002-00006-CCA-R3-CD, 2003 WL 214444, at \*3 (Tenn. Crim. App. Jan. 30, 2003) ("Findings of fact made by the trial court are given the weight of a jury verdict."). The trial court also found that the factors in *Adams* favored the State and that there was no reasonable possibility that the communication affected the verdict.

In considering the first *Adams* factor, we conclude that no extrajudicial evidence was imparted to any member of the jury. *See Adams*, 405 S.W.3d at 654 (concluding that a note left by the alternate jurors conveying their belief that the defendant was guilty did not contain extrajudicial evidence). Nothing in the message to Mr. Mitchell touched on the substantive evidence at trial or issues of guilt or innocence. No fact or opinion was imparted to the juror. *See Carruthers*, 145 S.W.3d at 92. The defense attempts to distinguish *Adams* by noting that the *Adams* opinion differentiated between communication with an alternate juror and communication with a witness. However, the cases cited in *Adams* for this proposition involved communications with third parties regarding substantive issues at trial. *See Adams*, 405 S.W.3d at 654-55. We conclude that, due to the absence of any substantive discussion in the communication, this factor clearly weighs in favor of the State. The fact that the juror initiated the communication in the instant case does not affect this determination.

The second factor also favors the State, as only Mr. Mitchell had contact with the witness. The third factor, implicating the manner and nature of the contact, is neutral, as the contact occurred when Mr. Mitchell was at home alone but also immediately prior to deliberations. *See Adams*, 405 S.W.3d at 655 (concluding that the third factor was neutral when the foreman received a note alone in his hotel room but during deliberations).

Finally, the evidence adduced at trial was particularly great. There was no dispute that the defendant shot the victim. Instead, the defense's theory was that the defendant shot her accidentally (or in self-defense) during a struggle and again shot her accidentally while trying to move her. Dr. Lewis's testimony established that the victim died of gunshot wounds and that she was shot twice. This was not a case of competing experts where jurors were choosing between Dr. Lewis's testimony and that of another medical expert. The only point of Dr. Lewis's testimony which bore on a contested issue was that the gun was fired from an "indeterminate range" and that Dr. Lewis found no evidence that the muzzle of the pistol had been held against the victim's skin. The range of the shot might have had some bearing on the jury's determination that the murder was premeditated. However, there was more direct evidence on the issue of premeditation in the form of the testimony of the defendant's girlfriend that he tried to convince her to kill the victim and that he put a gun to her head and asked, in the days immediately preceding the homicide, if she would stand by his side. The fact that the victim was shot twice also tends to support the conclusion that the crime was premeditated, as does the defendant's attempt to hide the blood-stained vehicle. *See State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000).

We conclude that there is no reasonable possibility that the contact with the witness altered the verdict and that it appears beyond a reasonable doubt that any error complained of did not contribute to the verdict obtained. *Adams*, 405 S.W.3d at 654; *Smith*, 418 S.W.3d at 46. The witness gave the juror no actual information during the exchange, with the exception of a warning that extra-judicial communication could lead to a mistrial. Accordingly, the presumption of prejudice raised by the communication was sufficiently rebutted by the State during the hearing.

We next consider whether, outside of the improper communication, there was any sort of prejudice, bias, or partiality within the jury that affected the defendant's right to a fair trial. Bias is a "'leaning of the mind; propensity or prepossession towards an object or view, not leaving the mind indifferent; . . . bent; [or] inclination.'" *State v. Akins*, 867 S.W.2d 350, 354 (Tenn. Crim. App. 1993) (quoting *Durham v. State*, 188 S.W.2d 555, 559 (Tenn. 1945)). Furthermore, "[a] juror's personal experiences directly relating to the parties may be extraneous information." *Carruthers*, 145 S.W.3d at 95. "'An extraneous influence on a juror is one derived from specific knowledge about or a relationship with either the parties or their witnesses.'" *Id.* (quoting *United States v. Herndon*, 156 F.3d 629, 636 (6th Cir.

1998)).

"[T]he constitutional guaranty of trial by an impartial jury requires the jury be free of even a reasonable suspicion of bias and prejudice." *Hyatt v. State*, 430 S.W.2d 129, 130 (Tenn. 1967). A challenge *propter affectum* – based on bias, prejudice, or partiality towards one party in the litigation – may be made after the return of the verdict. *Carruthers*, 145 S.W.3d at 94. When a juror willfully conceals or fails to disclose information concerning a potential bias during voir dire, a presumption of prejudice arises. *Akins*, 867 S.W.2d at 355. Bias will only be presumed upon an affirmative statement of bias, willful concealment of bias, or failure to disclose information that would call into question the juror's bias. *Smith v. State*, 357 S.W.3d 322, 348 (Tenn. 2011). The State may rebut the presumption by showing an absence of actual partiality. *Akins*, 867 S.W.2d at 357.

In this case, the attorneys did not ask the jurors if they were acquainted with Dr. Lewis, and accordingly no presumption of prejudice on this ground was triggered by Mr. Mitchell's failure to volunteer the information during voir dire. However, we conclude that Mr. Mitchell's communication within the Facebook message does trigger a presumption of prejudice. When Dr. Lewis warned Mr. Mitchell that there was a risk of mistrial, Mr. Mitchell responded, "I know...I didn't say anything about you." This communication indicates that although Mr. Mitchell was not asked if he knew Dr. Lewis, he believed that his acquaintance with her was a basis for mistrial, and he nevertheless persisted in refusing to disclose it. Willful concealment of bias is sufficient to trigger a presumption of prejudice, *Smith v. State*, 357 S.W.3d 322, 348 (Tenn. 2011), and we conclude that the presumption should apply when the facts demonstrate that the juror concealed information which he or she believed might prove a basis for mistrial. Accordingly, the question presented is whether the State has sufficiently rebutted the presumption of prejudice arising from the relationship of Dr. Lewis and Mr. Mitchell.

When a juror has a relationship with a witness or party or prior knowledge of a witness or party, the impartiality of the jury may be compromised. Particularly where the relationship is close or where the relationship involves a party or key witness, the disqualification of a juror or reversal of a conviction may be warranted. In *Hyatt v. State*, a juror had caused a search warrant to be issued for the residence of the defendant approximately five years prior to trial. *Hyatt*, 430 S.W.2d at 129. At trial, the juror did not recognize the defendant, who had gone by a different name at the time of the search, but he realized who she was during deliberations. *Id.* at 130. The court concluded that the presence of the juror raised a reasonable doubt regarding whether the jury had been impartial. *Id.*; *see also Toombs v. State*, 270 S.W.2d 649, 651 (Tenn. 1954) (concluding that a juror's failure to reveal a close relationship with the victim's wife required reversal); *Steven James Rollins v. State*, No. E2010-01150-CCA-R3-PD, 2012 WL 3776696, at *24 (Tenn. Crim. App. Aug.

31, 2012) (concluding that the State failed to rebut the presumption of prejudice that arose when a juror did not reveal a friendship with the victim).

However, a juror's prior relationship with a witness or party does not automatically lead to reversal. *Hugueley*, 185 S.W.3d at 379 (Tenn. 2006) (citing *Bristow v. State*, 219 A.2d 33, 34 (1966)). In *State v. Furlough*, a juror failed to disclose an acquaintance with a detective who was a witness for the State. The court, reversing on other grounds, noted that bias had not been shown because "[t]he testimony at the motion for new trial shows that the two individuals involved had a casual relationship at best." *State v. Furlough*, 797 S.W.2d 631, 653 (Tenn. Crim. App. 1990). Likewise, in *State v. Smith*, the court concluded that even if it were proven that a plumber who was on the jury had worked for one of the defendants, there was "simply no evidence that such employment affected his impartiality so as to affect the outcome of this trial." *State v. George Arthur Lee Smith*, No. E2006-00984-CCA-R3-CD, 2007 WL 4117603, at *28 (Tenn. Crim. App. Nov. 19, 2007). In *State v. Sparks*, one of the jurors became aware during trial that the defendant's mother had lived in an apartment complex which she managed, and she had a "passing acquaintance" with the defendant. *State v. Randall S. Sparks*, No. M2005-02436-CCA-R3-CD, 2006 WL 2242236, at *7 (Tenn. Crim. App. Aug. 4, 2006). The court concluded that any presumption of prejudice was rebutted by the testimony that she did not know the defendant well or have any bias for or against him or his family. *Id.*; *see also Tony Carruthers v. State*, No. W2006-00376-CCA-R3-PD, 2007 WL 4355481, at *48 (Tenn. Crim. App. Dec. 12, 2007) (concluding that a casual relationship between a juror and the defendant's mother was not inherently prejudicial); *State v. Joseph Angel Silva*, No. M2003-03063-CCA-R3-CD, 2005 WL 1252621, at *7 (Tenn. Crim. App. May 25, 2005) (concluding that presumption of prejudice was overcome because the evidence showed that the juror's relationship with the defendant's brother was that of casual acquaintance)*; State v. Christopher K. Knight*, No. W2001-02995-CCA-R3-CD, 2003 WL 721701, at *2 (Tenn. Crim. App. Feb. 27, 2003) (concluding that a juror's casual acquaintance with the victim did not establish bias and that bias could not be presumed because relationship was not elicited during voir dire); *State v. Curtis Cecil Wayne Bolton*, No. 03C01-9707-CR-00255, 1999 WL 93107, at *16 (Tenn. Crim. App. Feb. 25, 1999) (holding that the presumption of bias which arose when a juror did not reveal that he and the prosecutor had been roommates in college was rebutted by evidence that their relationship had been "casual at best" since that time and by failure to show that the relationship affected the outcome); *State v. Gayle T. Parsons, Jr.*, No. 01C01-9607-CC-00311, 1997 WL 766465, at *5 (Tenn. Crim. App. Dec. 12, 1997) (holding that a presumption of bias on the part of a juror who had not revealed that she had been a victim of a similar crime was rebutted by evidence that the juror had not exposed other jurors to extraneous information and that she had been one of three jurors who initially voted to acquit the defendant); *Bowman v. State*, 598 S.W.2d 809, 812 (Tenn. Crim. App. 1980) (concluding that a juror was not disqualified because there was no proof of bias or inherent

prejudice despite an acknowledged social relationship with the Assistant District Attorney who was ultimately called as a rebuttal witness); *Clariday v. State*, 552 S.W.2d 759, 772 (Tenn. Crim. App. 1976) (concluding that there was no showing of improper influence, actual partiality, or inherent bias when counsel failed to elicit that a juror was the student of the District Attorney General, who did not participate in the trial).

In denying the motion for a new trial, the trial court found that the relationship between the parties was that of "mere[] acquaintances." We conclude the evidence does not preponderate against this finding. Dr. Lewis and Mr. Mitchell knew each other casually from both working in the Pathology Department at Vanderbilt University Medical Center. They agreed that they saw each other in person rarely during the three years they worked together; their closest contact was by beeper or telephone once a week. Prior to trial, they had not exchanged direct messages through any social media or through email, and they had not seen each other in five years. Dr. Lewis recognized Mr. Mitchell as an acquaintance but did not realize who he was prior to receiving the Facebook message.

Despite all the evidence that the two were casual acquaintances at best, the substance of the message itself raises some doubts as to the impartiality of the juror. It was highly improper for the juror to disregard the instructions which the trial court had given regarding contact with witnesses. In addition, the tone of the message, which is in substance a compliment on Dr. Lewis's testimony, suggests partiality. Finally, we note that the discussion of the impropriety of the message appears itself improper. While Dr. Lewis testified that she intended to convey, in her response to Mr. Mitchell, that she found his communication inappropriate and that it could be the basis for a mistrial, her response as written implies that she believes that their acquaintanceship itself could be the basis of a mistrial, and it suggests doubt regarding whether the relationship will remain undisclosed.[4] Mr. Mitchell's reply demonstrates that he is aware of the risk of mistrial and has concealed the relationship thus far. Ultimately, Mr. Mitchell did not reveal either the relationship or the communication, although Dr. Lewis did so at once. The Tennessee Supreme Court, in remanding the case, observed the importance of avoiding contact on social media that could "'spawn public doubt about the capacity of the modern jury system to achieve justice.'" *Smith*, 418 S.W.3d at 50 (quoting St. Eve & Zuckerman, 11 Duke L. & Tech. Rev. at 12).

Nevertheless, we conclude that the State has sufficiently rebutted the presumption of prejudice through the testimony of Mr. Mitchell and Dr. Lewis. As the trial court found, the relationship of the parties was very distant. Facebook "friendships" frequently exist between

---

[4]Dr. Lewis wrote that there was a risk of mistrial "*if* that gets out." (Emphasis added.) Of course, Dr. Lewis did not conceal the communication or relationship but promptly brought them to the attention of the court the following day.

those who are indifferent to one another. While the tone of the exchange raises the specter of prejudice, Mr. Mitchell's unwarranted exuberance on discovering an old acquaintance does not demonstrate actual partiality, and all testimony presented at the hearing served to show that the juror did not harbor bias.[5] Furthermore, Mr. Mitchell's comment to Dr. Lewis was not based on his acquaintance with her but was rather his evaluation of the testimony presented at trial. A juror is, of course, free to evaluate the testimony of a witness, although communicating such an appraisal to the witness herself during trial is improper. As noted above, the proof in the case was particularly strong, and the testimony of the witness was mainly concerning uncontested issues. All the evidence established that the defendant shot the victim twice, and the defendant's theory at trial was that shootings were both accidental. Abundant proof, however, including the number of shots, the attempt to conscript Ms. Crawford into participating in the killing, and the attempt to hide evidence, supported the finding of premeditation. *See Nichols*, 24 S.W.3d at 302. We conclude that the State adequately rebutted the presumption of prejudice and that the defendant has not established that juror bias deprived him of the right to a fair trial.

## CONCLUSION

Based on the foregoing reasoning, we affirm the judgment of the trial court.

_____

JOHN EVERETT WILLIAMS, JUDGE

---

[5]Relying on *Dimas-Martinez v. State*, 385 S.W.3d 238, (Ark. 2011), the defendant urges that the act of disregarding the trial court's orders by communicating with the witness is in itself demonstrative of bias. However, we find that case, in which the juror posted multiple public tweets even after being individually questioned and admonished by the court, readily distinguishable.